*Comptroller of Maryland v. FC-GEN Operations Investments LLC*, No. 7, September Term, 2022, Opinion by Booth, J.

**ADMINISTRATIVE LAW & PROCEDURE — JUDICIAL REVIEW — AGENCY DEFERENCE ON MATTERS RELATED TO INTERPRETATION OF TAX LAWS**. In connection with judicial review of a Tax Court decision in which a party alleges an error of law, where the reviewing court determines that it is appropriate to give a degree of deference to an agency's interpretation of tax laws, the agency to whom deference is owed is the Comptroller, as the agency responsible for administering the tax laws and promulgating regulations for that purpose, not the Tax Court. To the extent that our prior cases have stated or suggested that the reviewing court owes deference to the Tax Court in the interpretation of tax laws that it "administers," and regulations promulgated in connection with its administration of the tax laws, we overrule this language.

**TAX STATUTE — REFUND OF ESTIMATED INCOME TAX PAYMENTS WHERE PASS-THROUGH ENTITY HAS NO TAX LIABILITY.** Under the plain language of § 13-901(a)(1) of the Tax-General Article of the Maryland Code, where a pass-through entity made estimated tax payments on behalf of its members, and it was later determined that there was a taxable loss for the year and, therefore, no tax liability, the pass-through entity was entitled to a refund of the estimated tax payments.

Circuit Court for Anne Arundel County
Case No.: C-02-CV-20-001089
Argued: September 9, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 7

September Term, 2022

COMPTROLLER OF MARYLAND

v.

FC-GEN OPERATIONS INVESTMENTS LLC

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Booth, J.

Filed: December 19, 2022

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In this case, we are asked to determine whether the Tax Court erred in reversing the Comptroller's denial of a pass-through entity's claim for a refund of estimated tax payments that it made during the 2012 tax year after the pass-through entity determined that it had no tax liability. We are also asked to determine whether, when undertaking judicial review of errors of law associated with a Tax Court's decision, our modern cases correctly state that agency deference principles apply to the Tax Court's interpretation of tax laws instead of the Comptroller's interpretation. We consider these questions within the context of the factual background and procedural history discussed below.

## I.
## Factual Background and Procedural History

FC-GEN Operations Investments, LLC ("FC-GEN"), is a limited liability company organized and existing under the laws of the State of Delaware. Through its subsidiaries, FC-GEN operates skilled and long-term care medical facilities and provides ancillary healthcare services throughout Maryland. Under Maryland tax laws, FC-GEN falls within the definition of a "pass-through entity."[1] A pass-through entity is any business entity that is not itself a taxable entity, so the income, loss, deductions, and credits of the entity pass through to its stockholders, partners or members who are then

---

[1] Md. Code Ann., Tax-Gen. ("TG") § 10-102.1(a)(7) (1988, 2010 Repl. Vol.) defines "Pass-through entity" as:

(i) An S corporation;
(ii) A partnership;
(iii) A limited liability company that is not taxed as a corporation under this title; or
(iv) A business trust or statutory trust that is not taxed as a corporation under this title.

taxed on that income in the same manner as other income.[2]  It is treated as a partnership for federal and Maryland income tax purposes with a tax year that is on a calendar year basis.

In the 2012 tax year, FC-GEN had 28 members, consisting of four individuals who were not residents of Maryland, 20 nonresident pass-through entities, two resident pass-through entities, one trust, and one not-for-profit foundation.

Under Maryland law, a pass-through entity with a Maryland nexus is responsible for the payment of Maryland income tax if it has any nonresident individual or entity members that have any taxable income attributable to the entity's Maryland operations that passes through to the nonresident members for the taxable year.  *See* Md. Code Ann., Tax-Gen. ("TG") § 10-102.1(b) (1988, 2010 Repl. Vol.).[3]  The tax imposed on the pass-through entity is treated as a tax imposed on the nonresident individuals or entities, which the pass-through entity pays on their behalf.[4]  In connection with the administration and collection of the taxes paid by the pass-through entity, the General Assembly has delegated authority to the Comptroller to "provide by regulation for the treatment of the tax imposed[.]" TG § 10-102.1(c)(2).

---

[2] *See State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 550 n.58 (2014).

[3] The issue in this case is whether FC-GEN was entitled to a refund of its estimated tax payments that were paid during the 2012 calendar year.  For this reason, we shall refer to the provisions of the Tax-General Article that were in effect in 2012, as well as the regulations in effect for that time-period.  The Code and regulations have been revised since that time.

[4] TG § 10-102.1(c)(1).

A pass-through entity is also subject to the provisions of Maryland tax law that require a corporation or partnership to file a declaration of estimated income tax if the entity reasonably expects estimated income tax for a taxable year to exceed $1,000[5] and to make quarterly estimated income tax payments in an amount of at least 25% of the estimated income tax shown on the declaration or amended declaration for the taxable year.[6]

In this case, FC-GEN complied with these requirements. Based upon projected 2012 income, FC-GEN made quarterly estimated tax payments that totaled $601,467. However, when FC-GEN prepared its 2012 federal income tax return, it determined that it had a taxable loss in the amount of $729,863 attributable to Maryland for the 2012 tax year. As a result of this loss, FC-GEN sought a refund of its estimated payments in the amount of $598,131.[7] After obtaining an extension to file its tax return for the 2012 tax year, FC-GEN timely filed a Maryland Pass-Through Entity Income Tax Return Form (Form 510) ("Income Tax Return"), associated Schedules K-1, and a Maryland Composite Pass-Through Entity Income Tax Return (Form 510C) ("Composite Return"). In completing these tax forms and associated schedules, FC-GEN's tax department reviewed the Comptroller's applicable Maryland rules, instructions, and regulations to determine how

---

[5] *See* TG § 10-816.

[6] *See* TG § 10-902(a)(1).

[7] The amount sought by FC-GEN represented the total estimated tax payment of $601,467, less a guaranteed payment of $3,336 that was made on behalf of one of its nonresident members. It is undisputed that no refund was due for the income tax associated with that payment, and it is, therefore, not part of our analysis.

to properly request a refund of its estimated tax payments. FC-GEN ultimately claimed its refund in the amount of $598,131 on the Composite Return.[8]

A pass-through entity may file a composite return on behalf of all or some of its nonresident members who are qualified to be included on the return. COMAR 03.04.02.04A(1). To qualify, the member must be a nonresident individual whose only Maryland income derives from the pass-through entity filing the composite return. COMAR 03.04.02.04B. The requirements for filing a composite return include a statement of verification that the nonresident individuals included in the composite return are qualified to be included. COMAR 03.04.02.04C(1).

To determine who was eligible to participate in the Composite Return, FC-GEN sent its individual nonresident members a 2012 Composite Election Form ("Election Form"). Among other things, the Election Form listed eligibility criteria for inclusion in the Composite Return and advised its members to consult with their tax advisors in completing the Election Form.[9] Only two nonresident individuals, Christopher Sertich

---

[8] FC-GEN did not seek a return of the $598,131 on its Income Tax Return because line 20—the line where a pass-through entity must enter the "Amount TO BE REFUNDED"—has a qualifier stating that line 20 is to be completed "only if there are no nonresident members." Because it had nonresident members, FC-GEN sought a refund on its Composite Return on line 17 entitled "Overpayment TO BE REFUNDED."

[9] The Election Form contained the following instructions:

> For your convenience, we describe below general information regarding the criteria for eligibility to be included in a composite return for a specific partner entity type. The specific criteria vary from state to state. *Please*

4

and Michael Jones, indicated that they were eligible to be included in the Composite Return. Based upon the completed Election Forms, FC-GEN included Mr. Sertich and Mr. Jones on the Composite Return.

In connection with the preparation of its income tax filings, FC-GEN also issued Schedules K-1 to its members. None of the members' Schedules K-1—except for one nonresident individual who had received a guaranteed payment—showed a value for the member's distributive pro rata share of the estimated nonresident tax paid by FC-GEN. Additionally, Section D on each member's Schedules K-1 entitled "Nonresident Tax" was left blank, except for the individual who received the guaranteed payment.

FC-GEN timely submitted its Income Tax Return, Schedules K-1, and Composite Return for the 2012 tax year to the Comptroller. In 2015, FC-GEN began contacting the Comptroller to request information regarding the status of its refund request. During one telephone inquiry in November 2016, FC-GEN was told that a refund in the amount of $598,131 had been scheduled, but that additional time was needed to process it. During another inquiry in December 2016, FC-GEN was told by a representative in the Comptroller's office that the refund was scheduled to be made. After years of email, telephone, and fax communications between FC-GEN and the Comptroller regarding

---

*consult with your tax advisor to determine for each state whether you are eligible to be included in the composite return.*

* * *

B) You (and/or your spouse) did not have any income that was sourced to the state which the partnership's income was sourced, other than the income from the partnership. . . .

the status of FC-GEN's refund request, the Comptroller ultimately denied FC-GEN's refund request on March 17, 2017, on the ground that the statute of limitations had expired.

FC-GEN timely appealed to the Comptroller's Office of Hearings and Appeals. During the hearing before the Comptroller's Office of Hearings and Appeals, the Comptroller's representative acknowledged that the refund request was indeed timely. However, the Comptroller's representative asserted that the refund should still be denied on the ground that the two nonresident members identified on the Composite Return, Mr. Sertich and Mr. Jones, were ineligible to be included in the Composite Return. Later, on July 26, 2018, the Comptroller issued a Notice of Final Determination denying FC-GEN's refund on the basis argued by the Comptroller's representative.

### A. Tax Court Proceedings

On August 23, 2018, FC-GEN appealed to the Tax Court to request an order that the Comptroller issue its requested refund and order interest to be paid. The Tax Court ordered the Comptroller to issue a refund to FC-GEN in the amount of $598,131, finding that FC-GEN "properly followed the Maryland Tax Form instructions" and "complied with the applicable tax laws" in requesting its refund. The Tax Court denied the request for interest, and FC-GEN did not file a petition for judicial review of the denial. The Comptroller filed a petition for judicial review to the circuit court, which affirmed the Tax

6

Court's order.  The Comptroller then appealed to the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland).[10]

### B.  The Appellate Court of Maryland

In an unreported opinion, the Appellate Court of Maryland affirmed the judgment of the Tax Court.  *Comptroller of Maryland v. FC-GEN Operations Investments, LLC*, 2022 WL 325940.  In upholding the decision of the Tax Court, the intermediate appellate court pointed out that judicial review of the Tax Court's factual findings, inferences therefrom, and findings of mixed fact and law is pursuant to a substantial evidence standard.  *Id.* at *3 (quoting *Frey v. Comptroller*, 422 Md. 111, 136 (2011) (additional citations omitted)).  The court noted that in *Frey*, this Court elaborated on how courts should review an agency's legal conclusions when interpreting  statutes or regulations, stating that a reviewing court "afford[s] great weight to the agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose."  *Id.* at *5 (quoting *Frey*, 422 Md. at 138).  Applying the deferential standard as articulated in *Frey*, the intermediate appellate court determined that it must "defer to the Tax Court's interpretation of the legal regulations as well as its factual findings."  *Id.*  Based upon its review of the record, the Appellate Court of Maryland determined that there was substantial evidence in the record to support the Tax Court's determination that FC-GEN

---

[10] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change too effect on December 14, 2022.

met the filing requirements for the Composite Return under the applicable regulations under the Tax Court's interpretation of the same. *Id.*

The Appellate Court of Maryland also rejected the Comptroller's argument that FC-GEN was not the proper claimant of the tax refund under the circumstances. *Id.* at *7. The intermediate appellate court characterized the statutorily required estimated tax remittances as "deposits" instead of "payments." *Id.* Based upon this characterization, the intermediate appellate court determined that the statutory and regulatory requirements pertaining to claims for refunds did not apply. *Id.* The court also determined that the voluntary payment rule, which prohibits recovery of a payment made to the State unless a common law exception or statutory provision applies allowing for a refund, was inapplicable. *Id.*

In his concurring opinion, Judge Friedman pointed out that courts generally defer to an agency's interpretation of statutes it administers, regulations it has promulgated, and other legal interpretations within the agency's subject matter expertise. *Id.* at *7 (Friedman, J., concurring). He observed that, in the context of tax laws, the General Assembly has delegated tax authority to the Comptroller, who promulgates the tax regulations, designs the tax forms, and employs the State's tax experts. *Id.* at *8 (Friedman, J., concurring). Judge Friedman noted that, historically, Maryland courts gave deference to the Comptroller on such matters, but that, at some point, courts "stopped deferring to the Comptroller and began deferring, instead, to the legal determinations of the Maryland Tax Court." *Id.* (Friedman, J., concurring) (citing *Frey*, 422 Md. at 138; *Comptroller v. Blanton*, 390 Md. 528, 533–35 (2006); *Comptroller v. Johns Hopkins Univ.*, 186 Md. App. 169, 188–89 (2009)). In his view, Maryland courts should be giving deference to the Comptroller, not the Maryland Tax

8

Court. That said, Judge Friedman concurred with the majority's opinion because it applied the deferential standard required by precedent. *Id.* at \*9 (Friedman, J. concurring).

The Comptroller filed a petition for writ of *certiorari* to this Court, which we granted to consider the following questions, which we have reordered and rephrased as follows:[11]

1. In connection with judicial review of a Tax Court's decision asserting an error of law, where the reviewing court determines that it is appropriate to give a degree of deference to the agency's interpretation of the law, does the reviewing court defer to the Comptroller's interpretation or the Tax Court's interpretation?

2. Is FC-GEN a "claimant who erroneously pa[id]" a tax and is therefore entitled to a refund under the plain language of TG § 13-901(a)(1)?

3. Did the Tax Court and intermediate appellate court err in finding that estimated tax remittances are "deposits," and not statutorily required "payments," when Maryland's doctrine of conformity requires the

---

[11] In the petition for writ of *certiorari*, the Comptroller phrased question 1 as follows:

Should this Court overrule recent decisions and hold that on judicial review of a decision in a tax case, the agency owed deference in the interpretation and application of tax law is the Comptroller, which has the subject matter expertise and to which the General Assembly has delegated authority to adopt legislative regulations, and not the Tax Court, the members of which are not required to have such expertise?

Following oral argument, we entered an order inviting the parties to submit supplemental briefing on the following question, which we have rephrased and reordered as question 2:

Whether a pass-through entity such as FC-GEN is a "claimant who erroneously pa[id]" a tax and so is entitled to file a refund claim under the plain language of TG § 13-901(a)(1); and if so, whether COMAR 03.04.07.03.D(4)(a), which prohibits the payment of a refund to a pass-through entity, is inconsistent with TG § 13-901(a)(1).

In response to our invitation, FC-GEN and the Comptroller each submitted supplemental briefing on this issue.

9

application of federal law to TG § 13-1104(c), and federal law considers them payments?

4. When properly applied, do Maryland's voluntary payment rule and the statutory framework for refunds of estimated taxes found in Title 13 of the Tax-General Article require denying FC-GEN's claim, which it improperly submitted for itself, under the law?

For the reasons set forth below, in response to question 1, we hold that, in connection with judicial review of a Tax Court decision in which a party alleges an error of law, where the reviewing court determines that it is appropriate to give a degree of deference to an agency's interpretation of tax laws, the agency to whom deference is owed is the Comptroller, as the agency responsible for administering the tax laws and promulgating regulations for that purpose, not the Tax Court. To the extent that our prior cases have stated or suggested that we owe deference to the Tax Court in the interpretation of tax laws that it "administers," and regulations promulgated in connection with its administration of the tax laws, we overrule this language.

With respect to question 2, we hold that, under the plain language of TG § 13-901(a)(1), FC-GEN is a claimant that is entitled to a refund. We affirm the judgment of the Tax Court on that basis. In light of our holding that FC-GEN was entitled to a refund of the estimated tax payments under the plain language of TG § 13-901(a)(1) because it had no tax liability for the 2012 tax year, we determine that there is no reason to answer questions 3 and 4.

10

## II.
## Discussion

### A. Standard of Review

"The Tax Court is an adjudicatory administrative agency in the executive branch of state government." *Comptroller v. Wynne*, 431 Md. 147, 160 (2013), *aff'd*, 575 U.S. 542 (2015) (internal quotations omitted); *see also* TG § 3-102. A decision of the Tax Court is subject to the same standards of judicial review as contested cases of other administrative agencies under the State Administrative Procedures Act ("APA"). TG § 13-532(a)(1) ("A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10-222 and 10-223 of the State Government Article.").[12] When reviewing a decision of an

---

[12] Section 10-222(h) of the State Government Article provides as follows:

(h) In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because of a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

administrative agency, this Court looks through the decisions of the circuit court and intermediate appellate court and evaluates the decision of the agency. *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492, 503 (2014) (quoting *Frey*, 422 Md. at 136–37) (cleaned up).

### 1. Review of Factual Findings

We review the Tax Court's factual findings and the inferences drawn therefrom under the substantial evidence standard, by which the court defers to the facts found and the inferences drawn by the agency when the record supports those findings and inferences. *Frey*, 422 Md. at 137. Under this standard, reviewing courts "consider whether a reasoning mind reasonably could have reached the factual conclusion" reached by the agency. *Id.* (internal quotations omitted). We view "the agency's decision in the light most favorable to the agency and trust[] the agency's resolution of 'conflicting evidence' and inferences drawn therefrom." *Broadway Servs., Inc. v. Comptroller*, 478 Md. 200, 214–15 (2022) (citing *Ramsay, Scarlett & Co., Inc. v. Comptroller*, 302 Md. 825, 835 (1985)).

### 2. Review of Legal Conclusions

We also review the agency's decision for errors of law. In contrast to the administrative agency's findings of fact, "[w]ith respect to an agency's conclusions of law, we have often stated that a court reviews de novo for correctness." *Schwartz v. Md. Dep't of Natural Res.*, 385 Md. 534, 554 (2005) (citing *Spencer v. State Bd. of Pharmacy*, 380 Md.

---

      (v)   is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

\*     \*     \*

(vii) is arbitrary and capricious.

12

515, 528 (2004)); *see also Maryland Dep't of the Env't v. County Comm'rs of Carroll County*, 465 Md. 169, 203 (2019) (noting that "a court will not uphold an agency action that is based on an erroneous legal conclusion"). The phrase "errors of law" encompasses a variety of legal challenges, including: (1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation. Although we do not apply any agency deference when undertaking a review of the first three types of legal challenges, we occasionally apply agency deference when reviewing errors of law related to the fourth category.

With respect to deference given to a state agency's interpretation of a statute that it administers, we have applied either a "no deference" approach, or "some deference." *See* Arnold Rochvarg, *Principles and Practice of Maryland Administrative Law*, §§ 19.1–19.3, 243–49 (2011). When discussing Maryland agency deference, treatises and law review articles frequently compare our application of agency deference principles to three federal deference doctrines: *Chevron* deference; *Skidmore* deference and *Auer* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 US. 837, 842–43 (1984); *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). We need not discuss in detail here the contours of these federal deference standards.[13] For our purposes, it is sufficient to simply note that *Chevron* deference is a highly deferential standard that applies when an

---

[13] For a more thorough discussion of the contours of these federal deference standards, *see* Carly L. Hviding, Note, *What Deference Does It Make? Reviewing Agency Statutory Interpretation in Maryland*, 81 Md. L. Rev. Online 12 (2021).

agency is charged with interpreting a statute the agency is administering. Carly L. Hviding, Note, *What Deference Does It Make? Reviewing Agency Statutory Interpretation in Maryland*, 81 Md. L. Rev. Online 12, 15 (2021). This Court has never applied *Chevron* deference to state agency decisions. *See* Rochvarg, *Maryland Administrative Law*, *supra*, §19.4 at 249 (observing that "*Chevron* deference goes well beyond the deference Maryland courts have given to agency interpretations of law[]"). *Auer* deference applies when an administrative agency interprets its own regulations. Hviding, *What Deference Does It Make?*, *supra*, at 17. "Under *Auer* deference, a federal court must defer to an agency's interpretation of an ambiguous regulation that the agency has promulgated unless the court finds that the interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Auer*, 519 U.S. at 461). No Maryland court has explicitly adopted the *Auer* doctrine to its review of a state agency's interpretation of its own regulations, but Maryland courts do give weight to agency interpretations of their own regulations unless the interpretation is plainly erroneous. *See Board of Liquor License Comm'rs v. Kougl*, 451 Md. 507, 514 (2017). *Skidmore* deference was the primary deference doctrine used by the federal courts from 1944 until it was displaced by *Chevron* deference in 1984. Hviding, *What Deference Does It Make?*, *supra*, at 15. In *Skidmore*, Justice Jackson, writing for the Supreme Court, stated that the weight a court will give an agency interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Skidmore.*, 323 U.S. at 140.

Turning to our agency deference jurisprudence, as we have repeatedly stated, we may apply a degree of deference to an administrative agency's legal conclusion to the extent it is "premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Broadway*, 478 Md. at 214–15 (citing *Frey*, 422 Md. at 138); *see also Maryland Dep't of the Env't*, 465 Md. at 203 (noting that, "in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation[]"). "When a party challenges the agency's interpretation of the statute the agency administers, the court must assess how much weight to accord that interpretation, keeping in mind that it is 'always within [the court's] prerogative to determine whether an agency's conclusions of law are correct.'" *Maryland Dep't of the Env't*, 465 Md. at 203 (quoting *Schwartz*, 385 Md. at 554) (brackets in original).

In *Baltimore Gas & Electric Co.*, we considered the meaning of a statutory term and the degree of deference that we would give the Public Service Commission's interpretation of the statute. 305 Md. at 161. We stated:

> The weight to be accorded an agency's interpretation of a statute depends on a number of considerations. Although never binding upon the courts, the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time . . . . Another important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute. When an agency clearly demonstrates that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process, the agency's interpretation will be accorded the persuasiveness due a well-considered opinion of an expert body . . . . In addition, the nature of the process through which the agency arrived at its interpretation is a relevant consideration in assessing the weight to be accorded the agency's interpretation. If the

15

> interpretation is the product of neither contested adversarial proceedings nor formal rule promulgation, it is entitled to little weight.

*Id.* at 161–62 (internal citations omitted). In other words, the deference owed to an agency's interpretation of the law will vary depending on a number of factors. In this regard, our sliding-scale approach to state agency deference is similar to federal *Skidmore* deference. Rochvarg, *Maryland Administrative Law*, *supra*, § 19.1 at 245. We give more weight "when the interpretation resulted from a process of 'reasoned elaboration' by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making." *Maryland Dep't of the Env't*, 465 Md. at 203–04 (citing *Baltimore Gas & Electric Co.*, 305 Md. at 161–62).

### 3. Review of Mixed Questions of Law and Fact

Finally, in considering this Court's role in reviewing a decision of the Tax Court involving mixed questions of law and fact, we have stated that "the resolution of [such questions] requires agency expertise." *Comptroller v. Science Applications Int'l Corp.*, 405 Md. 185, 204 (2008). In such cases, "we apply the deferential standard of review not only to [the agency's] fact-finding and its drawing of inferences, but also to its application of the law to the facts." *CBS v. Comptroller*, 319 Md. 687, 698 (1990) (quotations omitted); *see also Ramsey, Scarlett & Co.*, 302 Md. at 838 (holding that "whether a business is unitary or separate for tax purposes . . . is not solely a question of law" and, therefore, the Tax Court's decision on the question deserves deference. Thus, we must ask "whether, in light of the substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion reached by the Tax Court, consistent with a proper application [of

the tax statute in question]").  That said, "if the Tax Court's legal conclusions are wrong, a reviewing court may substitute the correct legal principles."  *NCR Corp. v, Comptroller*, 313 Md. 118, 134 (1988) (citations and internal quotation marks omitted).

### B. *Agency Deference on Questions of Law Related to the Interpretation of Tax Statutes*

Before we reach the substantive issue in this case—whether FC-GEN was entitled to a refund for estimated tax payments paid throughout the 2012 tax year where it later determined that it had no tax liability—we first address the procedural issue arising from Judge Friedman's concurrence in *FC-GEN*.  That is, to the extent that a reviewing court applies agency deference to an interpretation of a tax statute that the agency administers or regulations promulgated by the agency for that purpose, to whom is agency deference owed—the Tax Court or the Comptroller?  As we discuss in more detail below, our modern case law describes these deference principles in the context of the Tax Court's interpretation as opposed to the Comptroller's interpretation.  That said, historically, in circumstances where agency deference was warranted, we deferred to the Comptroller's interpretation.  Moreover, a survey of our cases reflects that, even in instances where we reference agency deference to the Tax Court's legal interpretation, we have rarely, if ever, applied such deference.  For the reasons more fully explained herein, we hold that, where deference is owed to an agency in the context of the interpretation and application of tax laws, the governmental agency to which deference is owed is the Comptroller, not the Tax Court.  To explain our holding, it is instructive to summarize the authority granted by the Legislature to

the Comptroller and the Tax Court, the nature of the functions performed by each separate and distinct entity, and our case law discussing agency deference in the context of tax laws.

### 1. Comptroller's Authority

Under Article VI, § 2 of the Maryland Constitution, the Comptroller is charged with the duty to "superintend and enforce the prompt collection of all taxes and revenue; adjust and settle, on terms prescribed by law, with delinquent collectors and receivers of taxes and State revenue . . . ." The Comptroller is responsible for administering the laws that relate to income tax. *See* TG § 2-102 ("[T]he Comptroller shall administer the laws that relate to: . . . (4) the income tax[.]"). The General Assembly has also given the Comptroller the authority to adopt reasonable regulations to administer the provisions of the tax laws, *see* TG § 2-103, and to "design the returns and other forms that, on completion, provide the information required for the administration of tax laws[,]" *see* TG § 2-104.

### 2. The Tax Court

"Despite its name, the Tax Court is not a court; instead, it is an adjudicatory administrative agency in the executive branch of state government." *Furnitureland S., Inc. v. Comptroller*, 364 Md. 126, 137 n.8 (2001); *see also* TG § 3-102. The Tax Court is created by statute. It consists of five judges who have jurisdiction to hear appeals of the final decisions relating to tax issues. TG § 3-103(a).[14] Matters within the Tax Court's

---

[14] The Tax Court consists of five judges appointed by the Governor, from which "the Chief Judge and at least 1 other judge shall be members of the Bar of the State." TG § 3-106(a). The Legislature requires geographic and political party diversity, requiring that: at least one judge shall be a resident of Baltimore City, 1 resident shall be a resident of the Eastern Shore, and 1 resident shall be from the Western Shore, TG § 3-106(a)(3), and no more than 3 judges may be from the same political party. TG § 3-106(b).

jurisdiction include: "(1) the valuation, assessment, or classification of property; (2) the imposition of a tax; (3) the determination of a claim for refund; (4) the application for an abatement, reduction, or revision of any assessment or tax; or (5) the application for an exemption from any assessment or tax." TG § 3-103. The Maryland Tax Court hears appeals from the final decisions of the State or local taxing authorities, including decisions of the Comptroller, property-tax assessment appeals boards, and local tax collectors. TG §§ 3-103, 13-510, Md. Code Ann., Tax Prop. § 14-512 (2019 Repl. Vol., 2022 Supp.). Although a decision of the Tax Court is subject to the same standards of judicial review as contested cases of other administrative agencies under the APA, that has not always been the case.

### a. Early History

The origins of the Maryland Tax Court can be traced to the Legislature's establishment of a State Tax Commission in 1914. 1914 Md. Laws ch. 841. The powers and duties of the Tax Commission included both administrative and quasi-judicial functions. With respect to its administrative duties, the Tax Commission was given "general supervision over the administration of the assessment and tax laws of the State." *Id.* at § 234. The Tax Commission had supervisory authority over all local property assessors and collectors, including the right to provide for a uniform system of accounts to be used by the tax collectors in the local jurisdictions across the State. *Id.* at § 234 (2)–(4). In connection with its administrative authority, the Tax Commission was required "[t]o confer with the Governor, Comptroller and Treasurer of the State as to the administration

19

of the tax laws, and to report biennially to the General Assembly its proceedings and recommendations." *Id.* at § 234(11).

The Tax Commission was also given quasi-judicial functions in connection with property tax assessments appeals. Any taxpayer who was aggrieved by an assessment order issued by the County Commissioners of any county or the Appeal Tax Court of Baltimore City (or the assessment supervisor of the local body in the event of an adverse determination) had a right to appeal to the State Tax Commission. *Id.* at § 238. A person aggrieved by the final decision of the Tax Commission had a right to appeal the decision to the circuit court of the jurisdiction in which the property to be assessed was located, with a further right to appeal to this Court. *Id.* at § 244.

### b. *Establishment of Tax Court by Legislature*

In 1959, the Maryland General Assembly enacted legislation to separate the quasi-judicial functions of the Tax Commission from its administrative functions. 1959 Md. Laws ch. 757. We discussed this legislation, which is the genesis of the Maryland Tax Court, in *Shell Oil Co. v. Supervisor of Assessments of Prince George's County*, 276 Md. 36, 39 (1975), and *Montgomery County Council v. Supervisor of Assessments of Montgomery County*, 275 Md. 339, 347 (1975). With the enactment of Chapter 757 of the Laws of 1959, the Legislature abolished the Tax Commission and created two separate agencies in its place: the Tax Court and the Department of Assessments and Taxation. *Montgomery County Council*, 275 Md. at 347. The "Tax Commission's 'quasi-judicial' functions were vested in the new Tax Court; and the Commission's 'administrative'

functions were vested in the Department of Assessments and Taxation." *Id.* The Tax

Court's jurisdictional authority was established as follows:

> On and after July 1, 1959, the Maryland Tax Court shall have jurisdiction to hear appeals from the decision, determination, or order of any final assessing or taxing authority of the State, or of any agency, department, or political sub-division thereof, with respect to the valuation, assessment, or classification of property, or the levy of a tax, or with respect to the application for an abatement or reduction of any assessment, or tax, or exemption therefrom.

1959 Md. Laws ch. 757.

The provisions pertaining to the newly established Tax Court were set forth in amendments to Article 81 of the Maryland Code (1957). The Tax Court had the authority to adopt rules and regulations concerning its proceedings, and was empowered to "assess anew, classify anew, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed from, provided that in the absence of any affirmative evidence to the contrary or of any error apparent in the face of the proceedings, the assessment, classification, or order appealed from shall be affirmed." Article 81, § 229(h). Any party to the proceedings had a right to appeal a final order of the Tax Court to the circuit court "wherein the property or any part of the property" that was the subject of the assessment was located. Article 81, § 229(l). The circuit court appeal was "de novo without a jury." Article 81, § 229(l). The legislation provided for a right of appeal to this Court. Article 81, § 229(m).

In 1966, the Legislature amended Article 81, § 229(l) by deleting the provision that provided for de novo review of the Tax Court's decision by the circuit court, and instead "requiring that the case be determined on the record of the Maryland Tax Court and

21

requiring that the Tax Court determination be affirmed unless erroneous as a matter of law or unsupported by substantial evidence appearing in the record." *Shell Oil*, 276 Md. at 39 (cleaned up).

In 1971, the Legislature once again amended the appeal provisions pertaining to judicial review of final orders of the Tax Court. Specifically, Article 81 was amended to provide a direct right of appeal to this Court instead of the circuit courts. *Id.* Although the amendments provided a direct right of appeal to this Court, the Legislature left intact the provisions providing for judicial review of the Tax Court's decision under the substantial evidence test. *Id.* In 1975, during the pendency of the *Shell Oil* case, the Legislature further amended the appeal provisions set forth in Article 81 to provide a right of appeal from the Tax Court to the Appellate Court of Maryland rather than this Court. *Id.* (citing 1975 Md. Laws ch. 448).

### c. The Shell Oil Case Holding that the Tax Court is a Quasi-Judicial Agency

In *Shell Oil*, this Court held that the statutory amendments providing for a direct right of appeal to either this Court or the Appellate Court of Maryland were unconstitutional. *Id.* at 40. This Court explained that, under Article IV, § 14 of the Maryland Constitution, the Supreme Court of Maryland may only exercise appellate jurisdiction, and the Legislature did not have the authority to confer original jurisdiction on the Court by statute. *Id.* We also held that the Maryland Constitution similarly limits the Appellate Court of Maryland's jurisdiction to appellate jurisdiction. *Id.* at 40–41. We pointed out that appellate jurisdiction does not arise until there is an initial exercise of judicial power or authority by a court. *Id.* at 42. We also noted that "review of the decision

22

of an administrative agency is an exercise of original jurisdiction and not of appellate jurisdiction." *Id.* at 43.

We rejected the notion that the Tax Court, although not a court, was performing judicial functions and, therefore, review in an appellate court was appropriate. *Id.* We explained that under the Maryland Constitution—unlike the Federal Constitution—the judicial function may be exercised only by those courts enumerated in the Constitution. *Id.* at 44. We noted that, "[w]ith the exception of the express authorization to create intermediate appellate courts of appeal, the General Assembly of Maryland, unlike Congress, is not empowered to create additional 'courts' to exercise judicial power." *Id.* We determined that any attempt by an agency to perform judicial functions would be a violation of separation of powers under Article 8 of the Maryland Declaration of Rights. *Id.* at 47 (citations omitted). That said, we observed that "[w]e have upheld the delegation to administrative agencies of some types of adjudications historically performed by courts, the delegation of so-called 'quasi[-]judicial' functions." *Id.* at 46. We determined that "[t]he Legislature has delegated certain duties to the Tax Court, the performance of which required it to make factual determinations and adjudicate disputes. The Tax Court, therefore, can be said to act in a quasi-judicial capacity." *Id.* at 47. We concluded that, since the Maryland Tax Court does not exercise a judicial function, review of a Tax Court decision is an exercise of original (as opposed to appellate) jurisdiction. *Id.* Consequently, we held that the provisions of Article 81 that provided for a direct right of appeal from the Tax Court to this Court or the Appellate Court of Maryland were unconstitutional. *Id.* at 47–48.

As a result of our decision in *Shell Oil*, the Legislature amended the statute to provide a right of appeal of a final decision of the Tax Court to the circuit court and that the review is to be undertaken within the judicial review provisions of the APA.[15]

### 3. Early Case Law Establishing a Degree of Deference to the Comptroller's Legal Interpretation of Tax Statutes it Administers

In the area of tax law, our jurisprudence dating back to the early 20th century applied the principle of agency deference to the agency administering the applicable statute. In *Baltimore v. Machen*, 132 Md. 618, 624 (1918), this Court affirmed the action of the State Tax Commission with respect to its interpretation of a statute imposing a tax upon a bank deposit, stating that "we do not feel warranted or justified in placing upon the statute a construction differing from that placed thereon by the taxing authorities of the [S]tate."

In connection with judicial review of the Comptroller's decisions, we have given deference to the Comptroller's interpretation of Maryland tax laws where the taxpayer's competing interpretation was at odds with the Comptroller's interpretative regulations promulgated contemporaneously with the tax statute in question. *See Palm Oil Recovery, Inc. v. Comptroller*, 266 Md. 148, 159 (1972) (affirming the decision of the Tax Court upholding the Comptroller's determination of a taxpayer's tax liability under the Maryland Sales Tax Act based, in part, on the Comptroller's regulations observing that, "[w]e have held on numerous occasions that the interpretation placed by the State Comptroller upon a taxing statute is entitled to great weight as an administrative interpretation acquiesced in

---

[15] *See* 1976 Md. Laws ch. 388; 1988 Md. Laws ch. 2.

by the Legislature"); *Frank J. Klein & Sons, Inc. v. Comptroller*, 233 Md. 490, 493 (1964) (affirming the Comptroller's order adverse to the taxpayer where the Comptroller's interpretation was based upon a rule promulgated when the law was enacted, stating that "we are not prepared to hold that the Comptroller exceeded his interpretive authority[]").

In other cases, we have declined to defer to the Comptroller's interpretation of applicable tax statutes and engaged in our own statutory analysis utilizing traditional canons of statutory interpretation. In *John McShain v. Comptroller*, 202 Md. 68, 73 (1953), we rejected the Comptroller's statutory interpretation that denied a taxpayer's tax exemption where the Comptroller's interpretation was a "strained or unreasonable construction that would defeat the purpose of the legislature."

Similarly, in *Comptroller v. M.E. Rockhill, Inc.*, 205 Md. 226, 236 (1954), we held that the Comptroller's denial of a taxpayer's application for an abatement of a Retail Sales Tax Act assessment based upon the Comptroller's interpretive rules was inconsistent with the Retail Sales Tax Act. Although we recognized the Comptroller's rulemaking authority under the Act, *id.* at 232, we stated that the "rules and regulations adopted by an administrative agency, to be valid, must be reasonable and consistent with the letter and policy under which the agency acts." *Id.* at 233 (citations omitted). We summarized the pertinent agency deference principles in the context of the Comptroller's interpretation of the Retail Sales Tax Act as follows:

> We have adopted the rule that the construction placed upon a statute by administrative officials soon after its enactment should not be disregarded except for the strongest and most cogent reasons. We have recognized that the interpretation placed by the State Comptroller on the Retail Sales Tax Act is entitled to great weight as an administrative interpretation acquiesced in

25

by the Legislature. We must emphasize, however, that such an interpretation is not binding upon the courts.

. . . .

There can be no question that an administrative official charged with the enforcement of a sales tax statute has no authority to promulgate a rule for the computation of a tax so as to impose the tax upon a transaction which is not taxable under the provisions of the statute. No tax can be lawfully imposed except upon express authority vested in the official who seeks to impose it. In interpreting a tax statute, the court must not extend its provisions by implication beyond the clear import of the language employed. Such a statute, in the case of doubt as to its scope, should be construed most strongly in favor of the citizen and against the State.

*Id.* at 233–34. (Citations omitted).

In *Scoville Service, Inc. v. Comptroller*, 269 Md. 390 (1973), this Court once again rejected the Comptroller's interpretation of a tax statute in connection with the denial of a refund. In reaching a contrary interpretation, we rejected the Comptroller's argument that we should follow the "long uninterrupted and continuous construction of the statute by the Comptroller." *Id.* at 396. We stated that, "[w]hile the interpretation placed by the State Comptroller upon a taxing statute is entitled to great weight as an administrative interpretation acquiesced in by the [L]egislature, an administrative interpretation contrary to the clear and unambiguous meaning of the statute will not be given effect." *Id.* (citations omitted).

As the above cases reflect, historically, this Court has applied principles of agency deference to the Comptroller's interpretation of tax statutes as the agency charged with the administration of the tax laws and regulatory authority to effectuate the administration of the tax laws. However, as Judge Friedman noted in his concurrence, at some point after

our decision in *Shell Oil*, the agency deference that we apply to the interpretation of tax statutes shifted from the Comptroller to the Tax Court.

### 4. Modern Appellate Cases Dislodging Deference Owed to the Comptroller in Favor of the Tax Court

The deference shift from the Comptroller to the Tax Court on legal interpretations of tax laws that the "agency administers" appears to have first materialized in some Appellate Court of Maryland opinions. In *318 North Market Street, Inc. v. Comptroller*, 78 Md. App. 589 (1989), in undertaking its statutory analysis, the court stated that "the interpretation placed *by the Comptroller and the Tax Court* upon a tax statute is entitled to great weight as an administrative interpretation acquiesced in by the [L]egislature, unless that interpretation is contrary to the clear and unambiguous language of the statute." *Id.* at 596 (quoting *Scoville Serv.*, 269 Md. at 396) (emphasis added) (internal quotation marks omitted).

In *Rouse-Fairwood Ltd. Partnership v. Supervisor of Assessments*, 120 Md. App. 667, 685 (1998), the court made no mention of agency deference to the Tax Court with respect to legal interpretations of tax statutes, stating that "[i]n contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review. . . . Consequently, if the Tax Court's decision is based on an interpretation of an ordinance or statute, we are not bound by the agency's interpretation."

The concept of agency deference to the Tax Court's legal interpretation of tax laws resurfaced in *Foss NIRSystems, Inc. v. Comptroller*, 151 Md. App. 44 (2003). In its discussion of the standard of review, the intermediate appellate court stated that "[u]nder the standard of review applicable today, we give appropriate deference to the tax court's

27

decision, even as to mixed questions of law and fact, *including in some instances the interpretation of statutes*." *Id.* at 61 (emphasis added).

In 2005, this Court substituted the Tax Court for the Comptroller in its discussion of agency deference in connection with our review of matters of statutory interpretation involving tax laws. In *Comptroller v. Citicorp International Communications, Inc.*, 389 Md. 156, 160 (2005), the Comptroller and the Tax Court disagreed on an issue of statutory interpretation regarding a taxpayer's refund request. *Id.* at 162. We granted the Comptroller's petition for writ of certiorari and affirmed the Tax Court's decision. *Id.* at 163. In reaching the same statutory interpretation as the Tax Court, we stated that:

> We are not at liberty to substitute our judgment for the expertise of the agency. Our role is to accord deference to an agency's interpretation of a statute which it administers. *Charles County Department of Social Services v. Vann*, 382 Md. 286, 295–96 (2004) (stating that a court gives deference to an agency's legal interpretation of its own statute or regulations); *Board of Quality Assurance v. Banks*, 354 Md. 59, 69 (1999) (noting that, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by the reviewing courts[]") (citations omitted).

*Id.* at 163.[16] We determined that the issue of whether the termination fee was subject to sales tax was "a mixed question of law and fact and compels a certain deference to the Tax

---

[16] Judge Wilner filed a dissent in *Citicorp.*, in which he disagreed with the Majority's characterization of the issue presented in the case as being a mixed question of law and fact. Judge Wilner regarded the issues in the case as being purely legal ones. *Citicorp*, 389 Md. at 181 (Wilner, J., dissenting). Concerning the majority's discussion on the applicable standard of review, he stated:

> I recognize that great deference is to be paid to the factual determinations of the Tax Court and that *some* deference is to be paid to its legal determinations. If the Tax Court, which, despite its name, is an administrative agency and not

Court's decision." *Id.* at 164–65. Despite our discussion concerning deference owed to the Tax Court's "interpretation of a statute it administers," we undertook an independent review of the statute in question, utilizing traditional tools of statutory construction, and reached our own legal interpretation without deferring to the Tax Court's interpretation of the statute. *Id.* at 165.

In *Comptroller v. Blanton*, 390 Md. 528 (2006), we granted the Comptroller's petition for writ of certiorari involving a taxpayer's appeal of the Comptroller's denial of an income tax credit that the taxpayer sought in connection with payment of income taxes in another state. The Tax Court upheld the Comptroller's decision to deny the credit, which was reversed by the circuit court. *Id.* at 530. We reversed the decision of the circuit court and remanded the case to that court with directions to affirm the decision of the Tax Court. *Id.* at 543. In our discussion of the standard of review that we apply in our review of a Tax Court decision, we did not discuss agency deference. We undertook our own statutory analysis, starting with the plain language of the statute, and confirming our interpretation based upon the legislative history of the tax statute in question. *Id.* at 537–43. After

a court, has misconstrued either a statute or a contract, however, it has made a legal error, and we are not obliged to give any deference at all to that kind of error. Indeed, we would be violating Art. 8 of the Maryland Declaration of Rights and Art. IV of the Maryland Constitution if, under the guise of deference to administrative expertise, we effectively abrogated, through delegation to an Executive Branch agency, our Constitutional responsibility to construe statutes and contracts and interpret the law.

*Id.* at 184 (Wilner, J., dissenting) (emphasis in original). As discussed herein, although we mentioned giving deference to the Tax Court's interpretation of the tax statute in question, our analysis reveals that we did not apply deference in that instance.

29

completing our own independent statutory review using traditional canons of statutory interpretation, in the concluding lines of our opinion we added that we "defer[red] to the decision of the Comptroller's office and its interpretation of [the applicable provision of the tax statute]." *Id.* at 543.

*Blanton* appears to be the last instance in which this Court mentioned giving deference to the Comptroller's interpretation of a tax statute. Since *Blanton*, in our discussion of the standard of review that we apply in our review of Tax Court decisions, we either do not discuss agency deference or state that we owe deference to the Tax Court's legal interpretation and application of tax laws that "it administers." *See, e.g.*, *AT&T Commc'ns of Maryland, Inc. v. Comptroller*, 405 Md. 83, 92–93 (2008) (noting the degree of deference owed to the Tax Court's interpretation and application of a statute that it administers but declining to apply deference on a "purely legal issue"); *Frey*, 422 Md. at 138 (stating that deference is owed to an "agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose[,]" but declining to apply deference to the Tax Court's interpretation of the United States Constitution, the Maryland Constitution, and the Maryland Declaration of Rights); *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492, 505 (2014) (same); *Wynne*, 431 Md. at 160–61 (same); *Travelocity.com LP v. Comptroller*, 473 Md. 319, 328–29 (2021) (stating that we owe deference to the Tax Court as the agency that administers and interprets tax statutes but declining to defer to the Tax Court on a conclusion of law).

Most recently, in *Broadway,* we stated that:

An administrative agency's legal conclusions are given deference to the extent that they are "premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Frey,* 422 Md. at 138. However, where an agency's decision is based on the "application and analysis of case law," the decision encompasses a "purely legal issue uniquely within the ken of a reviewing court." *Id.* Therefore, unless the agency's conclusion of law is a "purely legal issue uniquely within the ken" of the agency's expertise and experience, we review the conclusion *de novo* for correctness because "it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong." *Id.* at 67.

478 Md. at 214–15 (some internal citations omitted) (cleaned up).

In summary, our case law reveals that, although we have often stated that we defer to the Tax Court's interpretation of a tax statute that "it administers," we have not applied agency deference in such cases, instead choosing to conduct a de novo statutory review utilizing our traditional canons of statutory interpretation.

5. *A "Course Correction" on Agency Deference in Matters Related to Questions Arising Under Tax Statutes*

Based upon our survey of the opinions in this Court and the Appellate Court of Maryland described above, we agree with Judge Friedman that "[a]t some point, [] courts stopped deferring to the Comptroller and began deferring, instead, to the legal determinations of the Maryland Tax Court." *FC-GEN,* 2022 WL 325940, at *8 (Friedman, J., concurring). We also agree with Judge Friedman that this change could have been the result of this Court's decision in *Shell Oil* that the Tax Court was not a court, but a quasi-judicial agency, and the subsequent legislative amendments that placed judicial review of Tax Court decisions under the APA. *Id.,* at *8 n.10 (Friedman, J., concurring). At the very

31

least, the change occurred at a point in time after the judicial and statutory recognition of the Tax Court as an administrative agency. Finally, we agree with Judge Friedman's conclusion that "Maryland courts should be giving deference to the Comptroller not the Maryland Tax Court" and that "we have lost the thread" in our appellate opinions. *Id.* at *9 (Friedman, J., concurring).

As noted above, the Comptroller administers the tax laws, not the Tax Court.[17] In connection with the administration of the tax laws, the Legislature has delegated to the Comptroller the authority to adopt reasonable regulations to carry out its administrative functions,[18] including the preparation of tax forms.[19] These administrative functions enable the Comptroller to carry out its duty to collect the taxes that it is required by law to collect.[20]

The Tax Court does not administer the tax laws. It is a quasi-judicial agency that considers appeals from decisions of taxing authorities, including the Comptroller. Although the Tax Court may have expertise in tax laws, it does not undertake the regulatory or administrative functions that provide the basis for deferential review.

---

[17] *See* TG § 2-102 ("The Comptroller shall administer the laws that relate to" various tax laws enacted by the Legislature).

[18] *See* TG § 2-103 (stating that the Comptroller "shall adopt reasonable regulations to administer the provisions of the tax laws listed in [TG] § 2-102[]").

[19] *See* TG § 2-104 (stating that "the Comptroller shall design the returns and other forms that, on completion, provide the information required for the administration of the tax laws listed in [TG] § 2-102[]").

[20] *See* TG § 2-109 ("The Comptroller shall: (1) collect the taxes that the Comptroller administers or is otherwise required under this Article to collect[.]").

Because the Comptroller—not the Tax Court—is the agency that administers tax laws, we undertake a course correction and disavow the language in our cases that supports a contrary approach.[21]  We hold that, where a reviewing court applies agency deference to legal interpretations of a tax statute when undertaking judicial review of a Tax Court decision, the court may give appropriate deference to the Comptroller's interpretation of a tax statute—not the Tax Court's interpretation—to the extent the interpretation is premised upon a statute that the Comptroller administers and the regulations promulgated for that purpose.  The deference owed to an agency's interpretation of a statute, however, is always tempered by the judicial branch's constitutional duty to interpret the law.  Indeed, we would be violating Article 8 of the Maryland Declaration of Rights and Article IV of the Maryland Constitution "if, under the guise of deference to administrative expertise, we effectively abrogated, through delegation to an Executive Branch agency, our Constitutional responsibility to construe statutes . . . and interpret the law."  *Citicorp*, 389 Md. at 184 (Wilner, J., dissenting); *see also M.E. Rockhill*, 205 Md. at 336 (emphasizing that the Comptroller's interpretation of the Retail Sales Tax Act "is not binding upon the courts[]"); *Scoville Serv., Inc.*, 269 Md. at 296 (declining to give effect to the Comptroller's interpretation of a tax statute where it was "contrary to the clear and unambiguous meaning of the statute").

Turning to the application of these agency deference principles in this case, we determine that the issue in this case is a purely legal one—whether FC-GEN was entitled

---

[21] As reflected in the survey of our case law, given that we very rarely, if ever, apply a deferential standard of review to the Tax Court's interpretation of tax laws, our disavowal of the general discussion in these cases should not be interpreted as overruling the holdings in these cases or deviating from the analysis contained therein.

to a refund of its estimated tax payment under applicable provisions of the Tax-General

Article. We decline to give deference to the Comptroller's interpretation of the central

statutory provisions at issue in this case—TG §§ 10-102.1 and 13-901(a)(1)—because the

Comptroller's interpretation is inconsistent with the plain and unambiguous language of

the statute.

### C. Canons of Statutory Interpretation

Before we discuss the parties' competing interpretation of the applicable provisions

of the tax law, as well as the regulations promulgated by the Comptroller pertaining to

income tax liability for pass-through entities, it is useful to state the applicable provisions

of statutory interpretation that guide our analysis. "Our goal is to ascertain and effectuate

the intention of the legislature and we begin that exercise by reviewing the statutory

language itself." *Citicorp*, 389 Md. 156, 165 (quotations omitted). We read the plain

meaning of the language of the statute "as a whole, so that no word, clause, sentence or

phrase is rendered surplusage, superfluous, meaningless or nugatory." *Wheeling v. Selene

Fin. LP*, 473 Md. 356, 376 (2021) (quoting *Koste v. Town of Oxford*, 431 Md. 14, 25–26

(2013) (internal quotations omitted)). "Additionally, we neither add nor delete language

so as to reflect an intent not evidenced in the plain and unambiguous language of the statute,

and we do not construe a statute with forced or subtle interpretations that limit or extend

its application." *Wheeling*, 473 Md. at 376–77 (quoting *Lockshin v. Semsker*, 412 Md. 257,

274 (2010)) (cleaned up). "If the language of the statute is unambiguous and clearly

consistent with the statute's apparent purpose, our inquiry as to legislative intent ends

ordinarily and we apply the statute as written, without resorting to other rules of

construction." *Id.* at 377 (quoting *Lockshin*, 412 Md. at 275). That said, as the Court

recently reiterated in *Wheeling*,

> [w]e, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

> In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

473 Md. at 377 (quoting *Lockshin*, 412 Md. at 275–76) (internal quotations omitted).

Additionally, because we are tasked with interpreting a tax statute, "this Court

recognizes that any ambiguity within the statutory language must be interpreted in favor of

the taxpayer." *Citicorp*, 389 Md. at 165 (quoting *Supervisor of Assessments of Anne

Arundel County v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 461 (2004) (quoting *Comptroller

v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 484 (2003))). Finally, we note that, with

respect to our interpretation of regulations, we will not read them in isolation. Rather, "we

must interpret them in light of their enabling legislation." *Id.* (quoting *Worton Creek*

*Marina v. Claggett*, 381 Md. 499, 511 (2004)) (cleaned up).  With these principles in mind,

we turn to the applicable provisions of the Tax-General Article, as well as the regulations

promulgated by the Comptroller.

### D. Statutory Provisions Related to the Imposition of Income Tax upon Pass-Through Entities

#### 1. TG § 10-102.1 – Statutory Provisions Imposing Maryland Income Tax on Pass-Through Entities with Nonresident Members

TG § 10-102.1 sets forth the statutory requirements for the payment of income tax

by a pass-through entity that falls within its provisions.  Specifically, Maryland income tax

is imposed upon a pass-through entity with a Maryland nexus if it has any nonresident

individual or entity[22] members and any nonresident taxable income for the taxable year.

*See* TG § 10-102.1(b).[23]  The tax imposed under subsection (b) "shall be treated as a tax

---

[22] In the context of pass-through entities, the Tax-General Article defines "nonresidents" and "nonresident entities."  TG § 10-101.  "Nonresident" is defined as "an individual who is not a resident."  TG § 10-101(j).  "Resident" is defined, in part, as "an individual . . . who: 1. is domiciled in this State on the last taxable day of the year; or 2. for more than 6 months of the taxable year, maintained a place of abode in the State, whether domiciled in this State or not[.]"  TG § 10-101(k).  "Nonresident entity" is defined as "an entity that is not formed under the laws of the State and is not qualified by or registered with the Department of Assessments and Taxation to do business in the State."  TG § 10-102.1(a)(5).  For ease of reference, we sometimes collectively refer to nonresidents and nonresident entities of a pass-through entity as "nonresident members."

[23] During the 2012 tax year, TG § 10-102.1(b) stated:

In addition to any other tax imposed under this title, a tax is imposed on each pass-through entity that has:

(1) Any member who is a nonresident of the State or is a nonresident entity; and
(2) Any nonresident taxable income for the taxable year.

imposed on the nonresident or nonresident entity members that is paid on behalf of the nonresidents or nonresident entities by the pass-through entity." TG § 10-102.1(c). [24] With some exceptions that are not relevant here,[25] the statute establishes a formula for the computation of the income tax rate to be applied to the tax imposed on the pass-through entity to be paid on behalf of its nonresident members. *See* TG § 10-102.1(d)(1); COMAR 03.04.07.02.C.[26] Notwithstanding the income tax rate established by the formula in (d)(1), subparagraph (d)(2) limits the amount of the income tax to the sum of all of the pass-through nonresident members' share of the distributable cash flow. TG § 10-102.1(d)(2) states:

---

[24] As we mentioned in note 3, we are applying the tax laws and regulations that were in effect in 2012. Since that time, the General Assembly has amended TG § 10-102.1 to authorize a pass-through entity to elect to be taxed at the entity level for the state income tax on behalf of all of its members. 2020 Md. Laws ch. 641, 2021 Md. Laws ch. 39.

[25] *See* TG § 10-102.1(e).

[26] TG § 10-102.1(d)(1) states:

Except as provided in paragraph (2) of this subsection, the tax imposed under subsection (b) of this section is the sum of:

(i)      A rate equal to the sum of the rate of the tax imposed under § 10-106.1 of this subtitle and the top marginal State tax rate for individuals under § 10-105(a) of this subtitle applied to the sum of each nonresident's individual member's distributive share or pro-rata share of a pass-through entity's nonresident taxable income; and

(ii)      the rate of the tax for a corporation under § 10-105(b) of this subtitle applied to the sum of each nonresident entity member's distributive share or pro-rata share of a pass-through entity's nonresident taxable income.

37

The tax required to be paid for any taxable year on behalf of the nonresident or nonresident entity members by a pass-through entity *may not exceed the sum of all of the nonresident and nonresident entity members' shares of the pass-through entity's distributable cash flow.*

(Emphasis added). The pass-through income tax statute defines "distributable cash flow," which means, in pertinent part, "taxable income reportable by a pass-through entity on its federal income tax return for the taxable year[.]" TG § 10-102.1.[27] In other words, the tax required to be remitted under TG § 10-102.1 cannot be determined until the pass-through entity's actual federal taxable income or loss has been determined for the tax year in question, and the tax is then computed on the income tax return.

---

[27] In its entirety, TG § 10-102.1(a)(2) defines "Distributable cash flow" as: "taxable income reportable by a pass-through entity on its federal income tax return for the taxable year:"

(i) adjusted, in the case of an entity using an accrual method of accounting to report federal taxable income, to reflect the amount of taxable income that would have been reported under the cash method of accounting;

(ii) increased by the sum of:
1. cash receipts for the taxable year that are not includable in the gross income of the entity, including capital contributions and loan proceeds;
2. amounts allowable to the entity for the taxable year as deductions for depreciation, amortization, and depletion; and
3. the decrease, if any, in the entity's liability reserve as of the end of the tax year; and

(iii) decreased by the sum of:
1. cash expenditures for the taxable years that are not deductible in computing the taxable income of the entity, not including distributions to the shareholders, partners, or members; and
2. the increase, if any, in the entity's liability reserve at the end of the taxable year.

## 2. Statutory Provisions Related to the Pass-Through Entity's Obligation to Pay Estimated Taxes

Although the tax required to be remitted under TG § 10-102.1 cannot be computed until after the pass-through entity's taxable income is determined based upon its federal income tax liability for that calendar year, the pass-through entity is nonetheless required to file an estimated income tax declaration and make estimated income tax payments. TG § 10-816 states that "[e]ach corporation and partnership that reasonably expects estimated income tax for a taxable year to exceed $1,000 shall file a declaration of estimated income tax." A pass-through entity that is required to file quarterly estimated income tax returns shall pay "at least 25% of the estimated income tax shown on the declaration or amended declaration for a taxable year." TG § 10-902(a)(1).

## 3. Statutory Provisions Governing the Application of Estimated Tax Payment Where Taxes are Due

The pass-through entity income tax statute also sets forth the mechanics for the application of the estimated taxes paid by the pass-through entity pursuant to TG § 10-102.1 to the tax obligation of its members. Specifically, TG § 10-701.1 states that "[a]n individual or corporation may claim a credit against the State income tax for a taxable year in the amount of tax paid by a pass-through entity under § 10-102.1 of this title that is attributable to the individual's or the corporation's share of the pass-through entity's nonresident taxable income, as defined in §10-102.1(a)(6) of this title."

In summary, the statutory provisions discussed above establish the mechanics for the payment of estimated taxes by a pass-through entity, and the members' ability to receive a credit for taxes paid on the members' behalf. A tax is imposed on a pass-through

39

entity that has nonresident members and nonresident taxable income for the taxable year. TG § 10-102.1(b).  The tax required to be imposed may not exceed the sum of all the nonresident members' share of the pass-through entity's distributable cash flow.  TG § 10-102.1(d)(2).  The nonresident member may claim a credit against the member's state income tax obligation for that calendar year in the amount of the tax paid by the pass-through entity that is attributable to nonresident members' share of the pass-through entity's nonresident taxable income.  TG § 10-701.1.

4. *Statutory Refund Provision – TG § 13-901(a)(1)*

In other parts of the Tax-General Article, the General Assembly has set forth a refund process where taxes, fees, or charges are erroneously paid.  TG § 13-901(a)(1) states: "A claim for a refund may be filed with the tax collector who collects the tax, fee, or charge by a claimant who: . . .  erroneously pays to the State a greater amount of tax, fee, charge, interest, or penalty than is properly and legally payable[.]"  We will discuss this provision in more detail when we explore the parties' respective contentions concerning FC-GEN's ability to seek a refund.

E. *Regulations Promulgated by the Comptroller Related to Income Tax Payments by Pass-Through Entities*

The General Assembly has delegated to the Comptroller the authority to "administer the laws that relate to" certain enumerated types of taxes, including the Maryland income tax, *see* TG § 2-102(4), and to adopt reasonable regulations to administer the provisions of the enumerated tax laws, *see* TG § 2-103.  In addition to the administrative and regulatory authority provided to the Comptroller generally, with respect to pass-through entities

40

specifically, the General Assembly has directed the Comptroller to promulgate regulations for the treatment of income tax imposed on a pass-through entity "that is paid on behalf of a nonresident entity that is itself a pass-through entity." TG § 10-102.1(c)(2). The Comptroller also has authority to promulgate regulations for the filing of composite returns by a pass-through entity on behalf of its nonresident members and exemptions in certain instances. TG § 10-102.1(f).

Consistent with the authority conferred by the General Assembly, the Comptroller has promulgated regulations that, among other things: require the payment of estimated taxes by pass-through entities; require that the pass-through entity file an annual return that reconciles the estimated tax payments with the total tax liability computed on the return; permit nonresident members to claim a credit for the tax paid by the pass-through entity on the members' behalf; and permit the pass-through entity to file a composite return on behalf of its nonresident individual members under certain circumstances.

### 1. Estimated Tax Payment Requirements

The requirement that a pass-through entity file quarterly estimated tax returns tracks the statutory requirements set forth in TG § 10-816 and TG § 10-902(a)(1) and states, in part, that a pass-through entity shall file quarterly estimated tax returns if the total tax imposed under TG § 10-102.1(b) "is reasonably expected to exceed $1,000 for the taxable year." COMAR 03.04.07.03.B(1). The Comptroller "shall assess interest and penalties on

the underpayment of estimated tax based upon the unpaid tax from the due date of the tax to the date on which the tax is paid." COMAR 03.04.07.03.B(3).[28]

## 2. *Pass-Through Entity Income Tax Returns*

A pass-through entity that has a nonresident member is required to annually file an income tax return regardless of whether a tax is due. COMAR 03.04.07.03.C. The pass-through entity is required to file Schedules K-1 for each nonresident member with the income tax return. COMAR 03.04.07.03.A.(2). The Comptroller's regulations also state that "if the pass-through entity is required to file estimated tax returns, the annual return shall reconcile the total estimated taxes paid with the total liability computed on the return." COMAR 03.04.07.03.

## 3. *Credits for Tax Payments Attributable to a Nonresident Member's Share of Taxable Income*

Consistent with the language of TG § 10-102.1(c)(1), the regulations state that a "[t]ax required to be paid by the pass-through entity is paid on behalf of the nonresident members." COMAR 03.04.07.03.D.(1). Additionally, a "[t]ax attributable to a nonresident member's share of the nonresident taxable income that was paid by the pass-through entity shall be claimed by that nonresident member as a credit," as permitted by TG § 10-701.1, on:

(a) The tax return of the nonresident member; or

(b) A composite return filed on behalf of the electing nonresident member by the pass-through entity.

---

[28] "The unpaid tax is the lesser of: (i) 90 percent of the tax required to be shown on the return for the current taxable year; or (ii) 110 percent of the tax paid for the prior taxable year." COMAR 03.04.07.03.B(3).

COMAR 03.04.07.03.D.(2). Finally, the regulatory provisions that address credits for taxes paid state that:

Overpayments for tax shown on the annual return may not be:

(a) Refunded to the pass-through entity; or

(b) Applied to the current year estimated tax of the pass-through entity.

COMAR 03.04.07.03.D.(4).

### 4. Composite Returns

The Comptroller has also promulgated regulations that permit the filing of a composite return by the pass-through entity on behalf of some or all of its nonresident members. COMAR 03.04.02.04. To be included on the pass-through entity's composite return, the nonresident members must be individuals who elect in writing to be included on the composite return, and their only source of income in Maryland must be limited to the income received from the pass-through entity filing the composite return. COMAR 03.04.02.04. By seeking inclusion on the composite return, the nonresident members "agree that the pass-through entity is acting as their agent for the following purposes: (a) [f]iling an income tax return on their behalf; (b) [r]eceipt of any refund, and (c) [p]ayment of any tax due." COMAR 03.04.02.04.B. In addition, the composite return is required to include a "statement signed by an authorized official of the pass-through entity verifying that the nonresident individuals included in the return" qualify under the regulations. COMAR 03.04.02.0.04.C.(1). Stated another way, nonresident members who earn income from other Maryland sources in addition to the income received from the pass-through entity do not have the option to be included on the composite return; rather, they must

43

include their share of the pass-through entity's overpayment on their own individual tax return. As the Comptroller points out, the process laid out in the regulations reduces the extent to which the State must pursue nonresidents for the nonpayment of Maryland taxes, as it requires nonresidents to file a Maryland return if they wish to reclaim any overpayments made.[29]

## F. The Parties' Competing Interpretations of the Statute and Regulations

Although the parties disagree on the interpretation of the tax statute and the regulations, there is no dispute that FC-GEN had a loss for the 2012 tax year and accordingly, no tax was due. FC-GEN filed a Composite Return for the 2012 tax year, stating that it overpaid $598,131 and was seeking a refund in that amount. The Composite Return listed two nonresident members—Christopher Sertich and Michael Jones—who elected in writing to be included in the composite return. It later turned out that Mr. Sertich and Mr. Jones had Maryland income from sources other than FC-GEN and, therefore, were not qualified to be included in the Composite Return. Regardless of the status of these

---

[29] To illustrate this point, the Comptroller uses the following example. Under the regulations, a nonresident member of a pass-through entity who otherwise owes $100 in Maryland taxes from other Maryland activities cannot obtain a refund of $20 where the pass-through entity overpays taxes attributable to the nonresident member's share of income. Instead, the nonresident member must file an individual tax return and claim the overpayment as a credit against its other Maryland tax liability, thereby reducing its overall tax liability to $80. We agree with the Comptroller's example under the regulations where a resident nonmember has tax liability from Maryland income. However, as set forth more fully herein, to the extent that the Comptroller has promulgated regulations or applied them in a manner to preclude the pass-through entity from filing a claim for a refund where it erroneously paid the State a greater amount of tax than is properly and legally payable, the regulations are inconsistent with the plain language of TG § 13-901(a)(1).

members, FC-GEN sought the refund of the entire tax overpayment on its own behalf, and not simply on behalf of these nonresident members.

Although the Comptroller admits that FC-GEN made estimated tax payments in the amount of $598,131 and had no tax liability for the 2012 tax year, and acknowledged during oral arguments that the overpayment was "in error," the Comptroller argues that FC-GEN is not entitled to a refund because under the applicable statutory and regulatory provisions, any refund was required to be sought by the pass-through entity's individual members and not by the entity itself. In support of its argument, the Comptroller points to its own regulations, which provide that: "Overpayments of tax shown on the annual return may not be . . . refunded to the pass-through entity[.]" COMAR 03.04.07.03.D.(4)(a). The Comptroller also notes that its instructions to the taxpayer are consistent with the regulations, stating: "Note: Overpayments will not be returned to any [pass-through entity] that has any members that are nonresident individuals or nonresident entities." The Comptroller argues that its regulations do not permit the pass-through entity to receive the refund.

FC-GEN argues that the Court should not construe the plain language of the pass-through entity income tax payment requirements set forth in TG §10-102.1 in isolation and without regard to the tax refund provisions in TG § 13-901(a)(1). FC-GEN points out that the plain language of TG § 13-901(a)(1) expressly states that a claimant who erroneously pays a tax in an amount greater than that which is properly due and payable may file a claim for a refund. FC-GEN argues that the Comptroller has no authority to promulgate regulations

45

that would preclude the issuance of a tax refund in a manner that is inconsistent with the plain language of TG § 13-901(a)(1).  For the following reasons, we agree with FC-GEN.

### G. Under the Plain Language of the Statute, FC-GEN is a Claimant Who is Entitled to Seek a Refund

As set forth above, the General Assembly has set forth a process for the payment of refunds.  TG § 13-901(a)(1) states: "A *claim for a refund may be filed* with the tax collector who collects the tax, fee, or charge by a *claimant who: . . . erroneously pays* to the State a greater amount of tax, fee, charge, interest, or penalty than is properly and legally payable[.]" (Emphasis added).  The Comptroller agrees that FC-GEN erroneously paid estimated taxes where it had no income tax liability for the 2012 tax year.  The Comptroller disagrees, however, that FC-GEN is a "claimant" who is entitled to seek a refund.  The Comptroller asserts that the only proper "claimants" here are the members of FC-GEN, not the entity itself.  We disagree.

We start by noting that the word "claimant" is not defined in the statute.  In seeking to apply the plain meaning rule, it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning.  *Hoang v. Lowery*, 469 Md. 95, 120 (2020) (internal citations omitted).  "Claimant" is defined as "someone who asserts a right or a demand" or "someone who asserts a right against the government, esp. for money."  Black's Law Dictionary (11th ed. 2019).  The dictionary definition of the word "claimant" is broad.

Our review of the legislative history reveals that the word "claimant" first appeared in 1988, when, as part of Maryland's code revision, the General Assembly repealed the

predecessor statute, Article 81, § 215, and replaced it with TG § 13-901.[30]  1988 Md. Laws

ch. 2.  In the repealed version of the statute, the word "person" was used in place of

"claimant."  *See* Ann. Code Art. 81 § 215 (1979) ("Whenever any person shall have

erroneously or mistakenly paid . . . more money . . . than was properly and legally payable

. . . he may file . . . a written claim for the refund thereof.").  In *Latrobe Brewing Co. v.

Comptroller*, 232 Md. 64, 71 (1963), this Court discussed the meaning of the word

"person" as it was used in Article 81, § 215, stating:

> The modern general rule is that in the absence of a legislative intent to the
> contrary, the one required by law to do so, who paid the tax, is the one to
> claim and receive back on overpayment under a statute authorizing a refund.
> Sec. 215 of Art. 81 expressly authorizes 'he' who paid the excess in taxes to
> claim the refund.

In 1988, Article 81, § 215 was repealed and replaced with TG § 13-901.  1988 Md.

Laws ch. 2.  When the General Assembly enacted TG § 13-901, the drafters substituted the

word "claimant" for "person."  *Id.*  The Revisor's Note states "claimant" was substituted

for the former word "person" for clarity.  Because this change was made for clarification

purposes, we interpret the "claimant" in the same manner as our previous interpretation of

"person."  *See Moore v. RealPage Utility Mgmt., Inc.*, 476 Md. 501, 519 n.7 (2021) (stating

---

[30] As we have previously explained, "code revision is a periodic process by which statutory law is reorganized and restated with the goal of making it more accessible and understandable to those who must abide by it."  *Moore v. RealPage Utility Mgmt., Inc.*, 476 Md. 501 n.6 (2021) (internal quotations omitted).  "Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code."  *Id.* (internal quotations omitted).  In the 1988 Legislative Session, the Maryland tax laws were revised, restated, and recodified in a new Article of the Annotated Code "known as the Tax-General Article[.]"  1988 Md. Laws ch. 2.

47

our understanding that "code revision takes place 'for the purpose of clarity only and not substantive change, unless the language of the recodified statute unmistakably indicates the intention of the Legislature to modify the law.'") (quoting *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 444 (1996)). Accordingly, we interpret "claimant" similar to our interpretation of "person" under the predecessor statute and consistent with its dictionary definition—that is, the pass-through entity paid the estimated taxes and is therefore entitled to file a claim for a refund under the plain language of TG § 13-901.

The Comptroller disagrees with this plain language interpretation, contending that, because the "tax imposed" on a pass-through entity under TG § 10-102.1(b) is "treated as a tax imposed" on the nonresident members under TG § 10-102.1(c), the pass-through entity pays the estimated taxes on behalf of its members as their agent and, therefore, only the members may seek a seek a refund of the estimated taxes. In further support of its statutory interpretation, the Comptroller points to its own regulation which states that "[o]verpayments of tax shown on the annual return may not be . . . refunded to the pass-through entity[.]" COMAR 03.04.07.03.D.(4)(a). For the following reasons, we disagree with the Comptroller's statutory interpretation and its implementing regulation to the extent that the regulation is inconsistent with the clear and unambiguous meaning of TG § 13-901(a)(1) and TG § 10-102.1(d)(2).

Although TG § 10-102.1 addresses the *payment* of income taxes by a pass-through entity on behalf of its nonresident members, it is silent on the issue of the manner in which a *refund* may be sought. Elsewhere in the tax statute—in TG § 13-901—the Legislature has enacted statutory provisions that apply to refunds. As described in detail above,

subsection (a)(1) of TG § 13-901 contains broad and unambiguous language that permits a "claimant who . . . erroneously pays to the State a greater amount of tax . . . than is properly and legally payable" to claim a refund of the income taxes that are erroneously paid. In other words, the *tax payment provisions* set forth in TG § 10-102.1 that apply to pass-through entities must be read together with the *tax refund provisions* set forth in TG § 13-901(a)(1). To that extent, it is notable that the tax payment provisions provide that a nonresident entity's tax burden on behalf of its nonresident members may not exceed the share of its distributable cash flow attributable to the membership interests of those members. TG § 10-102.1(d)(2). However, if the Comptroller were correct that the nonresident entity could be precluded from seeking a refund of estimated taxes paid when the entity had actually suffered a loss, the effect would be to require the entity ultimately to pay on behalf of its nonresident members taxes greater than the amount of their pro rata share of the entity's distributable cash flow, in violation of TG § 10-102.1(d)(2). In other words, the Comptroller's interpretation is tantamount to requiring a pass-through entity to make distributions to its members (in the form of refunds of estimated tax payments paid by the pass-through entity), even when it does not have distributable cash flow and suffers a loss in that year. We agree with the Tax Court that, under the Comptroller's interpretation, the pass-through entity "would be forced to make a distribution to its members when not required under the Maryland tax laws."[31] Under our canons of statutory

---

[31] FG-GEN highlights the anomalous and unreasonable interpretation taken by the Comptroller with the following illustration. If FC-GEN had not paid any estimated tax payments for the 2012 tax year, it could have retained the entire $598,131, and would not

interpretation, we do not interpret a statute in a manner that leads to an illogical or absurd result. Although the Comptroller has the authority to promulgate regulations for the treatment of income taxes imposed on a pass-through entity, *see* TG § 10-102.1(c), as well as regulations for the filing of composite returns and tax exemptions, *see* TG § 10-102.1(f), it does not have the authority to promulgate regulations that are inconsistent with the plain language of the tax payment provisions of TG § 10-102.1(d)(2) and the tax refund provisions of TG § 13-901(a)(1). Stated another way, although we recognize the Comptroller's regulatory authority provided by statute, the regulations promulgated pursuant to such authority must be consistent with the clear and unambiguous language in the statute. *See M.E. Rockhill*, 205 Md. at 236.

We determine that, under the plain language of TG § 13-901(a)(1), where a pass-through entity "erroneously pays to the State" estimated taxes, and it later determines that it has a taxable loss and there is no tax liability due, the pass-through entity is a "claimant" who is entitled to file a claim for a refund. Under the undisputed facts presented here—where FC-GEN made quarterly estimated tax payments and subsequently determined that it had a taxable loss attributable to Maryland for the 2012 year, it erroneously paid to the State a greater amount of tax than was properly and legally payable and was therefore

---

have been subject to any penalties or interest because it had no tax liability. It would be illogical to penalize FC-GEN for complying with the requirement to submit estimated tax payments by, in essence, requiring it to make a forced distribution to its nonresident members in the form of individual tax refund payments where the members never had any tax liability in the first instance. Such an interpretation is also inconsistent with the plain language of TG § 13-901(a)(1), which permits a claim for a refund to be made by a claimant who erroneously pays to the State a greater amount of tax than is properly and legally payable.

entitled to file a claim for a refund under the plain language of TG § 13-901(a)(1). We affirm the Tax Court's order that FC-GEN is entitled to a refund in the amount of $598,131. In light of our resolution of question 2, we need not consider questions 3 and 4. Nor should our holding or this opinion be construed as our agreeing with the Appellate Court of Maryland's analysis on those issues.

### III.
### Conclusion

In conclusion, we hold as follows:

(1)     In connection with judicial review of a Tax Court decision in which a party alleges an error of law, where the reviewing court determines that it is appropriate to give a degree of deference to an agency's interpretation of tax laws, the agency to whom deference is owed is the Comptroller, as the agency responsible for administering the tax laws and promulgating regulations for that purpose, not the Tax Court. To the extent that our prior cases have stated or suggested that the reviewing court owes deference to the Tax Court in the interpretation of tax laws that it "administers," and regulations promulgated in connection with its administration of the tax laws, we overrule this language.

(2)     Under the plain language of TG § 13-901(a)(1), where FC-GEN, a pass-through entity, made estimated tax payments on behalf of its members and it was later determined that there was a taxable loss for the year and, therefore, no tax liability, FC-GEN was entitled to a refund of the estimated tax payments.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND IS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

51