*In the Matter of the Comptroller of Maryland*, No. 81, September Term, 2023. Opinion by Eyler, Deborah S., J. Filed November 22, 2024.

**TAX GENERAL ARTICLE ("TG") – SALES AND USE TAX – REFUND CLAIM – TIME TO FILE CLAIM AFTER NOTICE OF ASSESSMENT – EXEMPTION FROM SALES AND USE TAX FOR PRODUCTION ACTIVITY.**

Potomac Edison, a public utility that sells electricity in Maryland, informed the Comptroller's Office that it qualified for an exemption from sales and use tax under TG § 11-210(b), for tangible personal property it purchased to use directly and predominantly in a production activity. Potomac Edison buys the electricity it sells from a generating plant outside Maryland. It uses its own purchased equipment, comprising its transmission and distribution system ("T&D System"), to carry the electricity from the generating plant to its Maryland customers. As the electricity leaves the generating plant, travels, and arrives at the customers' locations, the T&D System steps its voltage up and down to enable efficient travel and to make the electricity usable by the customers. Under TG § 11-101(f), a production activity can mean the processing of tangible personal property, including electricity, for resale.

The Comptroller undertook an audit, which lasted several years. After concluding the audit, it issued a notice of assessment, assessing sales and use tax based upon a finding that Potomac Edison was not entitled to the exemption. Potomac Edison filed a claim for a refund and when that was denied, appealed to the Maryland Tax Court. The Tax Court upheld the denial of the refund claim, and on judicial review the circuit court affirmed the decision of the Tax Court. In an appeal by Potomac Edison, this Court reversed the judgment of the Tax Court, holding that it had erred as a matter of law by interpreting TG § 11-210(b) as not permitting a finding that any of Potomac Edison's T&D System was directly and predominantly used in a production activity. *Potomac Edison Co. v. Md. Comptroller of the Treasury*, No. 1645, Sept. Term, 2016 (filed Apr. 29, 2019). The matter was remanded to the Tax Court for further proceedings.

On remand, the Comptroller raised the issue of limitations for the first time, arguing that Potomac Edison's refund claim was untimely under the four-year limitations provision in TG § 13-1104; and that a written agreement between Potomac Edison and the Comptroller to extend limitations was ineffective because TG § 13-1104 operates to suspend sovereign immunity for a period of time that only the legislature can extend. After an evidentiary hearing, the Tax Court found that some of the materials Potomac Edison purchased to construct its T&D System were exempt from sales and use tax and some were not; therefore, Potomac Edison was entitled to a refund of a portion of the sales and use tax assessed against it, plus interest. It further found that the Comptroller was estopped to raise limitations. In an action for judicial review, the circuit court reversed the Tax Court's ruling on limitations but affirmed its ruling on production activity, and as a result affirmed a part of the Tax Court's refund award, with interest. Potomac Edison noted an appeal on the

limitations issue, and the Comptroller's Office noted a cross-appeal on the production activity issue.

*Held*: Judgment of the circuit court vacated in part and remanded with instructions to affirm the judgment of the Tax Court.

Under TG § 13-508, a taxpayer has thirty days from the date the Comptroller mails its notice of assessment to make a claim for a refund of sales and use tax. That thirty-day period is an express exception to the four-year limitations provision in TG § 13-1104, and therefore is the controlling time in which to make the claim. Potomac Edison filed its refund claim with the Comptroller's Office within the thirty-day period. Accordingly, the claim was timely. Because the timing of the refund claim was not controlled by TG § 13-1104, it is not necessary to decide the sovereign immunity issue.

The Tax Court heard evidence that the equipment comprising the T&D System falls into various categories. The court analyzed, based on expert witness testimony, whether each category of equipment was used directly and predominantly for the processing of electricity, which is a production activity. It determined that conductor, substation, and transformer equipment was used directly and predominantly to step up and step down voltage, a processing function necessary to make the electricity usable to end customers. (It also determined that certain equipment, such as support structures and electric meters, was not used for a processing function.) Accordingly, it concluded that this equipment was used in a production activity, and therefore was exempt from sales and use tax under TG § 11-210(b). The court's findings were supported by substantial evidence in the record and were such that a reasonable mind would reach. The Tax Court's decision that Potomac Edison was entitled to interest on the refund it was entitled to was supported by the governing statute.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 81

September Term, 2023

_____

IN THE MATTER OF THE COMPTROLLER
OF MARYLAND

_____

Shaw,
Albright,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: November 22, 2024

* Tang, Rosalyn, J. did not participate in the
Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This is the second appeal in a dispute between Potomac Edison Company ("Potomac Edison"), appellant and cross-appellee, and the Comptroller of Maryland ("Comptroller"), appellee and cross-appellant, over whether Potomac Edison is entitled to a refund of Maryland sales and use taxes. In the first appeal, we vacated the judgment of the Circuit Court for Baltimore City, which had affirmed a decision of the Maryland Tax Court that Potomac Edison did not qualify for the exemption on which its refund claim was based. We remanded for further proceedings in the Tax Court. *Potomac Edison Co. v. Md. Comptroller of the Treasury*, No. 1645, Sept. Term, 2016 (filed Apr. 29, 2019) ("*Potomac Edison I*").

After an evidentiary hearing on remand, the Tax Court ruled that Potomac Edison qualified in part for the exemption. It rejected the Comptroller's newfound contention that most of the refund claim was time-barred. The Tax Court awarded Potomac Edison a sales and use tax refund of $2,420,163.20, plus interest.

The Circuit Court for Anne Arundel County reversed on the issue of timeliness, reduced the refund award to $514,890.76, and otherwise affirmed.

Potomac Edison noted an appeal, presenting two questions, which we have combined and rephrased as one:

> I. Did the Tax Court err by ruling that Potomac Edison's refund request was timely?

The Comptroller noted a cross-appeal, presenting three questions, which we have combined and rephrased as two:

> I. Did the Tax Court err by ruling that Potomac Edison predominantly uses its conductor, substation, and transformer equipment for a production

activity, which is exempt from sales and use tax, rather than for the delivery of electricity, a non-exempt use?

II. Did the Tax Court err by granting Potomac Edison statutory interest on its refund claim?

We answer all these questions in the negative. Accordingly, we shall vacate the judgment of the circuit court, in part, and direct it to affirm the judgment of the Tax Court.

**FACTS AND PROCEEDINGS**

Because many of the facts are pertinent only to the appeal or only to the cross-appeal, we shall recite most of the facts in our discussion of the issues. The following is a basic summary.

Potomac Edison is a public utility doing business in Maryland, Virginia, and West Virginia. It purchases electricity generated at a power plant outside Maryland and uses its own equipment to carry the electricity from there to its Maryland customers. That equipment, including conductors, substations, circuit breakers, switches, transformers, capacitors, cables, wires, and related equipment, combine to make up Potomac Edison's transmission and distribution system ("T&D System").

In 2006, Potomac Edison informed the Comptroller that, in its view, much of the equipment it had purchased for its T&D System was exempt from sales and use tax under the Tax General Article ("TG") of the Maryland Code. That served as an impetus for the Comptroller to commence an audit of Potomac Edison, to determine its liability for sales and use tax on the purchase and use of equipment for its T&D System for the period of August 1, 2003 through July 31, 2007 ("the audit period").

2

The audit took several years. On April 8, 2011, the Comptroller mailed a Notice of Assessment for Sales and Use Tax ("Notice of Assessment" or "Notice"), thereby completing the audit. The Notice assessed sales and use tax of $1,757,862.18, interest of $1,309,958.90, and a penalty of $175,786.22, for a total amount of $3,243,607.30. Having learned in advance that the Notice would be issued, on April 1, 2011, Potomac Edison had filed with the Comptroller a Request for Refund of Maryland Sales and Use Tax ("Refund Request"). Less than thirty days after the Notice was mailed, Potomac Edison filed with the Comptroller a Petition for Redetermination of Sales and Use Tax Liability ("Redetermination Petition").

The Comptroller denied Potomac Edison's Refund Request and Redetermination Petition. It concluded that the exemption Potomac Edison was relying on, which concerned equipment used in a "production activity," more specifically, in processing, did not apply.

Potomac Edison requested a hearing on the denials, which was held before a hearing officer. On behalf of the Comptroller's Office, the hearing officer issued Notices of Final Determination on both, denying them. Potomac Edison filed a timely administrative appeal to the Tax Court. That court held a hearing, and on January 22, 2015, issued a memorandum opinion and order rejecting Potomac Edison's refund claim. Potomac Edison filed a petition for judicial review in the Circuit Court for Baltimore City, which affirmed. It then noted an appeal to this Court.

In our unreported opinion in *Potomac Edison I*, we reversed the circuit court's judgment and remanded the matter to the Tax Court for further proceedings. We explained that, given the statutory language, there could be no genuine dispute that "some degree of

3

processing was required between the point at which Potomac Edison received the electricity from the generating plant and the point of delivery to its residential and commercial customers." *Potomac Edison I*, slip op. at 17-18.

The Tax Court held a hearing on remand and issued an opinion framing the "principal issue" for decision as "which equipment [purchased by Potomac Edison] was used 'directly and predominantly' in 'processing' the electricity [it] sold." It determined that some of the equipment was used directly and predominantly in processing electricity, and calculated that Potomac Edison was entitled to a refund of $2,420,163.20, plus interest. It also ruled that Potomac Edison was entitled to an offset credit of $1,198,119.13 against the audit assessment, reducing its total outstanding liability to $559,743.04. The court rejected an argument, raised by the Comptroller for the first time on remand, that Potomac Edison's refund claim was time-barred.

The Comptroller sought judicial review of the Tax Court's decision in the Circuit Court for Anne Arundel County.[1] That court affirmed the Tax Court's exemption determination but rejected its limitations ruling. It held that TG § 13-1104(g) barred

---

[1] Pursuant to TG § 13-532(a)(1), "[a] final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10-222 and 10-223 of the State Government Article." State Government Article § 10-222(c) provides that "[u]nless otherwise required by statute, a petition for judicial review shall be filed with the circuit court for the county where any party resides or has a principal place of business." Here, there is no statute that provides otherwise. The Comptroller's main office is located in the Goldstein Treasury Building, in Annapolis, Anne Arundel County, but it does business and has other offices throughout the State of Maryland. Potomac Edison's principal place of business is not in Baltimore City. In the first action for judicial review, filed by Potomac Edison in the Circuit Court for Baltimore City, there was no challenge to venue and we make no observation about whether venue was proper. Venue clearly is proper in Anne Arundel County.

4

Potomac Edison's refund claim except for tax payments made between April 1, 2007 through July 31, 2007. It affirmed the award of interest on the payments made during that period. This appeal and cross-appeal followed.

## STANDARD OF REVIEW

The Tax Court is an administrative agency and therefore, on appellate review, we look through the decision of the circuit court and evaluate the Tax Court's decision. *Comptroller of Maryland v. FC-Gen Operations Invs. LLC*, 482 Md. 343, 359 (2022). "We review the Tax Court's factual findings and the inferences drawn therefrom under the substantial evidence standard, by which [we] defer[] to the facts found and the inferences drawn by the agency when the record supports those findings and inferences." *Id*. *See also Comm'r of Lab. & Indus. v. Whiting-Turner Contracting Co*., 462 Md. 479, 490 (2019) ("Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (cleaned up)). On questions of law, we may apply a degree of deference to an administrative agency's legal conclusions that are "premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Broadway Servs., Inc. v. Comptroller of Maryland*, 478 Md. 200, 214-15 (2022) (cleaned up). In the context of Maryland tax statutes, when we apply agency deference, the deference is to the Comptroller's interpretation of the statutes it

5

administers and rules it promulgates; we do not give deference to the Tax Court, which is an adjudicatory agency. *FC-Gen Operations Invs*., 482 Md. at 378.[2]

**DISCUSSION**

**<u>APPEAL</u>**

**I.**

**a.**

Before addressing the parties' contentions, we shall review in detail provisions of the Tax General Article that bear on the time for a taxpayer to make a claim for a refund of sales and use tax.

Title 13 of the Tax General Article governs "Procedure," and Part III of Subtitle 5 applies to "Appeals Generally." TG § 13-508 is entitled "Applications for revision of tax assessment, refund claims." That section designates a time period in which a taxpayer must submit an application to revise a tax assessment, if the assessment has not been paid, or submit a claim for a refund, if the assessment has been paid. In either situation, the application or claim must be submitted to the tax collector "[w]ithin 30 days after the date on which [the] notice of assessment of . . . sales and use tax . . . is mailed [to the] person or governmental unit against which the assessment is made[.]" TG § 13-508(a). If not, the

---

[2] In *Comptroller of Maryland v. FC-Gen Operations Investments, LLC*, 482 Md. 343, 359 (2022), the Supreme Court of Maryland corrected decades of case law that had held that when a reviewing court gives agency deference in a case interpreting a tax statute, deference would be given to the Tax Court, not to the Comptroller. Indeed, that was the law when we decided *Potomac Edison I*. The Supreme Court made clear that any agency deference the reviewing court gives is given to the Comptroller, not the Tax Court. The parties to this case have not cited *FC-Gen Operations Investments*, and have not made any argument that it has any impact on the issues presently before this Court.

assessment becomes final. TG § 13-508(b). When an application for revision or a claim for a refund is made, the Comptroller or a designee must promptly hold an informal hearing, take action, and mail notice to the taxpayer of the final determination. TG § 13-508(c). The final determination may be appealed to the Tax Court, TG § 13-510(a)(2), and that court's decision may be appealed to the circuit court. TG § 13-532(a).

Subtitle 9 of Title 13 is entitled "Refunds and Offsets." A taxpayer may file "[a] claim for refund" with the tax collector if the taxpayer paid the State a "greater amount of tax . . . than is properly and legally payable" or was "erroneously, illegally, or wrongfully assessed[.]" TG § 13-901(a).[3] After the claim is filed, the tax collector shall investigate, hold a hearing if requested by the claimant, make a final determination, and give the claimant notice of the determination. TG § 13-904(a)–(b). The decision may be appealed to the Tax Court. TG § 13-510(a)(2). Unless the refund amount is less than one dollar or the taxpayer owes other taxes, the taxpayer shall be paid any refund that has been allowed. TG § 13-905(a). For a refund of sales and use tax, the tax collector shall pay the refund amount or allow a credit against future sales and use tax. TG § 13-905(e).[4]

---

[3] In addition, TG § 13-901 allows at subsections (b) through (h) for filing refund claims for certain types of taxes, including the sales and use tax, at subsection (g). None of the particulars of subsection (g) apply to the situation in the case at bar.

[4] The Comptroller must maintain a "refund account" consisting of sales and use tax revenue. TG § 2-1301 ("From the sales and use tax revenue, the Comptroller shall distribute the amount necessary to pay refunds relating to the sales and use tax to a refund account."). Thus, refunds of sales and use tax are paid from an account created for that purpose that is funded by sales and use tax revenue.

A claim for a refund under Subtitle 9 "shall be filed within the time required under [TG] § 13-1104." TG § 13-903. Subtitle 11, entitled "Limitations," states at TG § 13-1104(g): "Except as provided in § 13-508 of this title, a claim for refund of sales and use tax may not be filed after 4 years from the date the tax was paid." The Tax General Article also includes a limitations provision that applies to actions by the State to recover taxes. For the sales and use tax, a recovery action by the Comptroller must be brought within four years "from the date on which the tax is due." TG § 13-1102(a).

The Comptroller may extend the time for filing a sales and use tax return, for good cause shown, for a reasonable period of time. TG § 11-503. If granted, an extension of time to file the return does not stop interest from accruing on the amount owed. TG §13-601(b). The Tax General Article does not include a provision for the extension of time to file a claim for a refund.

**b.**

In the proceeding before the Tax Court on remand, the Comptroller took the position, for the first time, that Potomac Edison was not entitled to a refund for the period of August 1, 2003 through March 2007 because its Refund Request was filed more than four years after the tax was due, in violation of TG § 13-1104(g). Thus, any refund Potomac Edison might receive would be limited to the sales and use tax it paid during the four-month period from April 2011 through July 2011. Recognizing that it had not raised this issue previously, the Comptroller argued that the defense was not waived because it was a "condition precedent" to the claim, and therefore could not be waived. Potomac Edison countered that certain "Extension Agreements" it had entered into with the Comptroller

8

enlarged the time for it to file its refund claim, and because it filed that claim before the last extension expired, the entire claim was timely. The Comptroller replied that the doctrine of sovereign immunity applied, which meant the time for filing a refund claim only could be extended by an act of the legislature, not by any agreement of the parties.

The evidence pertinent to limitations essentially was undisputed. Before the Tax Court on remand, evidence came in through documents and through the testimony of Gerard Quinlan, a principal of Ryan, LLC ("Ryan"), a firm that provided tax consulting for Potomac Edison during the audit period, and of Timothy Bowman, the assistant chief auditor for the Comptroller. The following was established.

As the audit continued for years, the Comptroller sought to avoid the risk that any recovery action it might bring against Potomac Edison would be barred by TG § 13-1102. William Cole, the Business Tax Manager in the Compliance Division of the Officer of the Comptroller ("Compliance Division"), asked Potomac Edison to enter into an "Extension of Limitations" agreement, which Potomac Edison did. Over time, as each such agreement expired, the parties entered into a new one. Those agreements all stated in relevant part:

> In consideration of the agreement of the Comptroller not to take immediate action to levy a deficiency assessment and to institute other collection procedures, taxpayer consents to the extension, until the expiration date of this agreement, of the period(s) of limitation applicable to the assessment of [sales and use] taxes . . . including statutory penalty and interest charges, which may be found by the Comptroller to be due for the period covered by this agreement. In addition, taxpayer consents to the waiver of any defense of limitations as to the collection of any taxes, penalties or interest assessed within the period of this extension and subsequently determined to be due.

Mr. Cole signed the extension agreements on behalf of the Comptroller. The final agreement was executed on January 21, 2011, and expired on April 30, 2011.

9

Mr. Quinlan testified that he worked with Mr. Cole with respect to the Potomac Edison audit in "the months and years preceding" the final extension agreement. The standard practice was to wait until the audit was more or less concluded before submitting refund schedules. Mr. Cole told Mr. Quinlan that his "goal was to finish up his audit assessment schedules and then for [Ryan] to submit the refund schedule and any reductions to his schedules after he had issued his work papers[.]"

Emails introduced into evidence showed that on March 7, 2011, Mr. Cole advised Ryan that he was nearing completion of the audit. Two days later, Ryan sent Mr. Cole an "overview of the legal and factual basis" for the refund claim Potomac Edison would be making. In a conference call on March 10, 2011, Mr. Cole confirmed to Mr. Quinlan that the waiver of limitations in the active extension agreement also covered Potomac Edison's refund claim. On March 22, 2011, Mr. Cole advised Potomac Edison that the expected refund claim was going to be denied in full and directed Potomac Edison to file a formal refund claim. With respect to "the issue of the waiver," Mr. Cole said he would "note it in the file that the claim is being submitted as part of the audit and the waiver will also apply to the refund items. [Potomac Edison] should also restate this request and his assurance in the claim cover letter."

On April 1, 2011, Potomac Edison filed with the Compliance Division a formal letter, dated March 29, 2011, titled "Request for Refund of Maryland Sales & Use Tax," that is, the Refund Request, seeking, pursuant to TG § 13-901(g), a refund of $2,684,680.37 in sales and use tax. The letter, by Mr. Quinlan, was addressed to Mr. Cole. Attached to it was an eight-page "Statement of Grounds," almost all of which was devoted to the

10

production activity exemption argument. Half a page was devoted to interest offset and interest on credits.

On April 8, 2011, the Comptroller's Office mailed to Potomac Edison the Notice of Assessment for Sales and Use Tax for the audit period, concluding the audit. As noted above, the Notice assessed $1,757,862.18 in tax, $1,309,958.90 in interest, and a $175,786.22 penalty, for a total of $3,243,607.30. The Notice directed Potomac Edison how the assessment was to be paid and stated, "If you disagree with this assessment, you must appeal in writing within 30 days of the date of this notice to" the Compliance Division of the Comptroller's Office, and if so, a hearing would be scheduled. If not, the assessment would become final and collectible.

On May 6, 2011, within the thirty-day time period, Potomac Edison submitted to Mr. Charles Zephir, the Acting Manager of the Hearings and Appeals Section of the Comptroller's Office, a certified letter by Mr. Quinlan, dated May 5, 2011 and entitled "Petition for Redetermination [of] Sales and Use Tax," that is, the Redetermination Petition, with attached twelve-page "Statement of Grounds."[5] The letter stated that on March 29, 2011, "a claim for refund of taxes overpaid during the audit period" was filed that "contains similar contentions as are outlined in this Petition for Redetermination." On behalf of Potomac Edison, Mr. Quinlan asked "that the refund claim and petition be processed and reviewed concurrently[,]" and attached the Refund Request and Statement of Grounds and "a summary of the supporting overpayment schedule[.]"

---

[5] The Redetermination Petition, Statement of Grounds, and attachments also were faxed to Mr. Zephir on May 6, 2011.

11

The first seven pages of the Statement of Grounds in support of the Redetermination Petition are devoted to the same production activity exemption argument as in the Refund Request, with almost exactly the same wording. Pages 8 through 12 are devoted to contentions about safety exemptions, non-taxable services, safety signs, tax paid to vendor, pollution control exemptions, penalty abatement, waiver of interest, combining of overpayments and underpayments for penalty and interest offset, and overlapping collections of the same taxes. On page 10, the Statement of Grounds says: "On May 6, 2011, [Potomac Edison] is issuing payment to the Comptroller for the entire tax assessment of $1,757,862.18, but does not waive any rights to appeal the audit assessment." The Statement goes on:

> As part of the audit, [Potomac Edison] currently has a credit refund pending that was denied, as a matter of Comptroller policy with no legal basis [c]ited for the denial. Depending on the outcome of the pending credit refund, the majority of the assessed tax and interest may also be decreased. As this is a gray area, [Potomac Edison] fully intends to pursue the refund based on current MD Law.

As represented, Potomac Edison paid the $1,757,862.18 tax assessment.

On May 9, 2011, Mr. Cole emailed an associate of Ryan confirming what he (Mr. Cole) had said in their May 5, 2011 conversation, that "the period for the requested [Maryland Sales and Use Tax] refund of $2,684,680.37 is covered by the same extension of limitations agreement that was signed for the now-concluded [Sales and Use Tax] audit. That period is August 1, 2003 through July 31, 2007."

As noted previously, on January 10, 2012, a hearing was held on the Refund Request and the Redetermination Petition before a hearing officer. Two separate "Notices of Final Determination" were issued on May 10, 2012. The heading of one stated:

**Requested Refund:** **$2,684,680.37**
**Refund Allowed:** **$0.00**
**Refund Denied:** **$2,684,680.37**

The first paragraph of that Notice of Final Determination explained that it was a denial of Potomac Edison's "request for revision of the Comptroller's denial of refund of sales and use tax paid for the above referenced tax period, pursuant to [TG] § 13-508(c)." The Notice of Final Determination proceeded to review the testimony presented to the hearing officer and explain why the Refund Request was being denied.

The second Notice of Final Determination listed the following in its heading:

| ASSESSED AMOUNT | | FINAL AMOUNTS DUE | |
|---|---|---|---|
| **Tax:** | **$1,757,862.18** | **Tax:** | **$1,757,862.18** |
| **Interest:** | **1,309,958.90** | **Interest:** | **1,484,796.77** |
| **Penalty:** | **175,786.22** | **Penalty:** | **175,786.22** |
| **Total:** | **$3,243,607.30** | **Subtotal:** | **$3,418,455.17** |
| | | **Payment:** | **-1,757,862.18** |
| | | **Total:** | **$1,660,582.99** |

That Notice of Final Determination stated: "This is the Comptroller's final determination on your request for revision of the sales and use tax assessment for the above referenced tax period, pursuant to [TG] § 13-508(c)." The review of testimony and explanation for why the Petition for Revision was denied in that Notice of Final Determination is the same as in the other Notice of Final Determination. Both Final Determinations were appealed to the Tax Court.

13

Timothy Bowman testified as a witness for the Comptroller. He explained that the Comptroller must complete an audit of a taxpayer within four years after the tax was paid and, if the audit could not be completed by then, the Comptroller "would enter in[to] a statute of limitation agreement with the taxpayer[.]" Such an agreement would specify the audit period involved, the type of tax, and an expiration date, and would "allow the taxpayer to provide additional documentation to the audit staff[.]" If the taxpayer did not agree to the extension, the Comptroller would issue an estimated assessment "based upon the best available information at that time." Mr. Bowman opined that, because the language of the extension agreement does not mention refund claims, the agreement only applies to the deadline for the Comptroller to assess taxes; it does not extend the time within which a taxpayer can file a refund claim. He conceded, however, that during the entire audit period, it was the Comptroller's standard practice to "allow[] the refund to be submitted under the statute of limitations that was agreed to as part of any audit that was being conducted at that time." According to Mr. Bowman, that standard practice was "a fairness issue[.]"[6] Mr. Bowman was aware that Mr. Cole told representatives of Potomac Edison "that the refund and offset credits would be covered under the extension agreement that was executed for the audit." He acknowledged that, when Mr. Cole made those statements, they were "an accurate reflection of the Comptroller's practice[,]" and Mr. Cole had the authority to make the statements.

---

[6] Mr. Bowman testified that as of the time of the Tax Court hearing, that practice was "in review." During oral argument before this Court, counsel for the Comptroller's Office said the practice still was under review.

14

Mr. Bowman explained the difference between offset credits and refunds. An offset credit can be claimed when a taxpayer has overpaid some taxes but also has tax liability resulting from an audit. The amount of the overpayment is an offset against the liability, resulting in a reduced total tax liability. An offset credit claim may be made within "the audit period." If the amount of the claimed offset credit exceeds the total liability, the taxpayer must make a refund claim to receive money in excess of the liability.

On November 30, 2021, the Tax Court issued its ruling on remand, which it supplemented with a revised opinion issued on March 17, 2022. On the limitations issue, it found that Mr. Cole had expressly represented to Potomac Edison that its right to file a refund claim was enlarged by the extension agreements, and that Potomac Edison had reasonably relied on that representation, which stated the Comptroller's policy and which Mr. Cole was authorized to impart. On those facts, the Tax Court concluded that the Comptroller was "estopped from asserting that the Extension of Limitations Agreement does not apply to Potomac Edison's refund claim[.]"

**c.**

Potomac Edison contends the extension agreement between the parties enlarged the time for it to claim a refund, as Mr. Cole had represented, and that, given Mr. Cole's representation, the Comptroller is equitably estopped to take a contrary position. The Comptroller responds that "the limitations period [in TG § 13-1104] constitutes a limited waiver of sovereign immunity" that only can be enlarged by the legislature, which means that even if the extension agreement applied to the time for Potomac Edison to file a refund claim, the extension agreement was ineffective. In addition, the Comptroller may not be

15

"estopped from asserting the correct legal position when performing its government duties[.]" Finally, if we were to conclude that estoppel could apply, the evidence before the Tax Court showed that the earliest that Potomac Edison detrimentally relied upon Mr. Cole's representation was January 2007.

In our view, a threshold question of law in this case is whether Potomac Edison's refund claim was controlled by the four-year limitations provision in TG § 13-1104 at all. We conclude that it was not and that the deadline that did apply was satisfied.[7]

As explained, TG § 13-508(a) sets out the time period for a taxpayer to make a refund request when the Comptroller has issued a notice of assessment of sales and use tax. In that circumstance, the taxpayer has thirty days from the date the notice of assessment was mailed to submit a request for revision (if it does not pay the assessment) or a request for a refund (if it pays the assessment). Under TG § 13-903, a claim for a refund under Subtitle 9 – which governs refunds and offsets – "shall be filed within the time required under [TG] § 13-1104." Subsection (g) of TG § 13-1104, which specifically applies to sales and use tax, provides that a refund claim may not be filed after four years from when the tax was paid, **"[e]xcept as provided in § 13-508 of this title[.]"** TG § 13-1104(g) (emphasis added). Thus, the thirty-day time limit for submitting a refund request of sales and use tax after the mailing of a notice of assessment is an exception to the four-year limitations period that applies to refund claims under TG § 13-1104.

---

[7] Because we conclude that Potomac Edison's refund claim was timely filed, we do not address the issue of estoppel. Our not doing so should not be read as a comment one way or the other on the substance of that issue.

16

In the case at bar, the Comptroller's Office mailed the Notice of Assessment to Potomac Edison on April 8, 2011. Potomac Edison had submitted its Refund Request to the Comptroller on April 1, 2011, one week prior, having been informed in advance that the audit was about to end, the relief requested was going to be denied, and to submit its refund request. Within thirty days of April 8, 2011, Potomac Edison filed its Redetermination Petition.[8] It attached its already-submitted Refund Request and asked that the two be considered together. In the Statements of Grounds supporting its Refund Request and its Redetermination Petition, Potomac Edison's primary argument was that the sales and use tax assessed against it was on property that should be deemed exempt from sales and use tax. The day after it filed its Redetermination Petition, it paid the tax assessed, minus the interest and penalty.

This is not a situation in which two statutes designate a time period for a taxpayer to make a refund claim and it is not clear which statute applies. The four-year limitations provision for refunds of sales and use tax in TG § 13-1104(g) expressly excepts refund claims governed by TG § 13-508. Potomac Edison's Refund Request (and its Petition for Redetermination) fell squarely under TG § 13-508(a), as it was made in response to the Notice of Assessment that brought the audit to an end and was mailed to it by the Comptroller's Office. It does not matter that the Refund Request was filed one week before the Notice was mailed. It was attached to the Redetermination Petition, which was filed

---

[8] TG § 13-508(a) sets the time for a "person or governmental unit" to submit an application for revision or a claim for a refund to "the tax collector[.]" As a corporation, Potomac Edison is a "person," under the definition of that word in TG § 1-101(p)(1). The Comptroller's Office is a "tax collector." TG § 13-101(e)(2)(i).

within the thirty-day period designated in TG § 13-508(a), and the two were decided together by the Comptroller's Office, on the exact same grounds. Those decisions resulted in Potomac Edison's appeal to the Tax Court, and ultimately the appeals to this Court.

Because Potomac Edison's claim for a refund of sales and use tax was made within thirty days of the mailing of the Notice of Assessment, it was timely. Whether the extension agreements entered into by Potomac Edison and the Comptroller's Office could enlarge the limitations period under TG § 13-1104 is not an issue we need to decide, as that statute did not govern the time period for Potomac Edison to make its refund claim. Accordingly, the circuit court's decision on that issue was legally incorrect.

## CROSS APPEAL

### I.

#### a.

In Maryland, a retail sale or use of tangible personal property or a taxable service is subject to the sales and use tax. TG § 11-102(a). There is a rebuttable presumption that the tax applies to any sale in the State of Maryland. TG § 11-103(a).

By law, there are some exemptions from the sales and use tax. Under TG § 11-210(b), that tax,

> Does not apply to a sale of: (1) tangible personal property . . . used directly and predominantly in a production activity at any stage of operation on the production activity site from the handling of raw material or components to the movement of the finished product, if the tangible personal property . . . is not installed so that it becomes real property[.]

As pertinent, a "production activity" means "processing[] or refining tangible personal property for resale" or "generating electricity for sale or for use in another production

18

activity[.]" TG § 11-101(f)(1)(i)–(ii). "Tangible personal property" includes electricity. TG § 11-101(k)(2)(iii). "Production activity" does not include "maintaining tangible personal property" with exceptions not relevant here. TG § 11-101(f)(2)(ii).

The voltage of the electricity as it exits the power plant from which Potomac Edison purchases it and enters the T&D System is 20 to 40 kilovolts. Efficient transmission of electricity through the T&D System requires even higher voltages. The voltage for use of electricity by a residential or typical commercial customer of Potomac Edison is only 120 to 240 volts, however. Therefore, the voltage of electricity that leaves the power plant is "stepped up" by a transformer or other equipment and then is "stepped down" by a transformer or other equipment before it enters a customer's home or place of business.

From the outset, Potomac Edison's position has been that stepping up and down the electricity traveling through its T&D System from the generating plant to the end user's location is "processing"; "processing" is a "production activity" that qualifies for an exemption from sales and use tax for certain equipment used for resale of electricity to end users. It maintains that it used its tangible personal property that makes up the T&D System "directly and predominantly in a production activity."

In denying the exemption the first time, the Tax Court focused on definitions in the Tax General Article categorizing the transmission, distribution, and delivery of electricity as a "taxable service," finding that Potomac Edison did not qualify for an exemption based on that definition. It determined that the transmission and distribution of electricity to consumers was not a "production activity" because Potomac Edison was neither "processing" nor "manufacturing" electricity.

19

In *Potomac Edison I*, we explained that "[t]he fact that an activity may be taxable as a service does not negate the possibility that there are production activities that must be performed in order to provide the service." Slip op. at 16. We reiterated Potomac Edison's position that "the processing of electricity it performs in order to transmit, distribute, and deliver electricity meets the statutory definition of a 'production activity,' and therefore, the equipment it must purchase to perform that production activity should be exempt from sales and use tax." *Id*. In reversing the Tax Court (and the circuit court), we reasoned that whether the transmission and distribution of electricity is a "production activity" largely is a matter of statutory interpretation. *Id*. at 12.

The essence of the parties' dispute was whether "the operations performed by Potomac Edison that are necessary for it to resell the electricity it purchases from the generating entity fall within the statutory definition of being 'a production activity.'" *Id*. at 13 (footnote omitted). Applying the plain language of TG § 11-101(f)(1), we determined that Potomac Edison was processing or refining electricity, which by definition is tangible personal property, and there was no dispute that "within the transmission and delivery network, the voltage of the electricity is stepped up and stepped down, as needed, to ensure that it travels long distances and is made available to Potomac Edison's customers at a voltage that is appropriate for the intended residential or commercial use." *Id*. at 15. Referencing the dictionary definition of "process," we concluded that subjecting electricity to a "method, system, or technique" to make it "useable" was a "production activity." *Id*. (cleaned up).

We held:

20

> [T]he Tax Court erred in ruling as a matter of law that the processing of electricity that occurs between the generating power plant and the site of the end users is not a production activity that qualifies for an exemption from Maryland sales and use taxes for certain equipment used in processing electricity for resale.

*Id*. at 1. We noted that, on remand, the Comptroller might "have viable arguments that not *all* of the equipment as to which Potomac Edison claimed a refund was used 'directly and predominantly' in 'processing' the electricity it was selling[.]" *Id*. at 17 (emphasis in original). However, the Tax Court erred by concluding that "none" of the equipment was used for an exempt production activity.

**b.**

On remand before the Tax Court, the Comptroller took the position that to be entitled to a refund under TG § 11-210(b)(1), Potomac Edison had to show that its tangible personal property was used directly and predominantly in a production activity, at any stage of the production activity site from the handling of raw materials to the movement of the finished product; that the production activity was not used to maintain Potomac Edison's tangible personal property, including electricity; and that the tangible personal property would not be installed so as to become part of the real property. The Comptroller maintained that the T&D System equipment was not used in a production activity because it was being used to maintain the electricity not to process it. It argued that even if some of the T&D System equipment were being used to process electricity (and not to maintain it), that was not the direct and predominant use of the equipment, which was delivery of electric power. Alternatively, certain T&D System equipment was annexed to real estate and, consequently, did not qualify for the exemption.

21

Potomac Edison countered that this Court's decision in *Potomac Edison I* foreclosed the Tax Court from revisiting whether the transmission and delivery of electricity is a production activity and whether the T&D System equipment for which the exemption was claimed was used in that production activity. In Potomac Edison's view, the only issue before the Tax Court was whether the T&D System equipment it purchased during the audit period was used "directly and predominantly" for that purpose.

In addition to calling Mr. Quinlan, Potomac Edison called Billy Don Russell, Ph.D., a professor of electric power engineering at Texas A&M University, and Lawrence Hozempa, an electrical engineer who worked as the general manager of planning in the Transmission, Planning, and Protection Department of First Energy Service Corporation.

Mr. Quinlan testified about the methods Ryan used to analyze the assets purchased by Potomac Edison during the relevant time to determine their function and whether they were used "directly and predominantly in changing the form or characteristics of electric energy." He organized the assets that satisfied that threshold into five "buckets": 1) Conductor Equipment, which is utility wire and related equipment; 2) Distribution, which includes electric meters; 3) Foundation and Support Structures, which includes clamps, bolts, and brackets supporting machinery and equipment; 4) Substation, which includes machinery and equipment used at substations; and 5) Transformer, which includes overhead transformers, pad-mount transformers, pedestal transformers, and one mobile transformer.

Dr. Russell opined that the T&D System equipment was "one hundred percent of the time directly and predominantly used for a production [activity] by processing that

22

electrical energy on a continuous basis to put it into the form that is necessary for use by the customer" and that there was not "any other purpose." Electric energy cannot be used by the end customers at "the voltage that comes out of a generator" and must be processed and refined to a "useful form." He emphasized that Potomac Edison does not "deliver the product, electric energy, in the form that it was purchased." The "delivery" of electric energy is unlike the delivery of water or gas, which travels through a pipeline. Rather, electric energy is being generated on a continuous basis and is being transformed by the component parts of the T&D system, which acts as "one integral machine."

Mr. Hozempa testified about how specific equipment within Potomac Edison's T&D System functioned within the overall system and within the "buckets" identified by Mr. Quinlan. On cross-examination, Mr. Hozempa was asked whether the predominant use of the T&D System was to deliver power to customers. He responded that the predominant use was to "provide customers with electric energy[,]" clarifying that the energy had to be processed in order to be useable to the consumer. He was confronted with his deposition testimony, in which he had suggested that the predominant reason Potomac Edison steps up and steps down voltage within the T&D System is to improve efficiency and reduce line loss, not as a means of processing it to reach the customer in a useable form. He clarified that efficiency was "part of the design of the machine" and goes "hand in hand" with processing the energy, which was, in his view, the "predominant use." On redirect examination, he reiterated that the equipment Potomac Edison was claiming as exempt was "integral and essential" for the production activity of processing electric energy.

23

The Comptroller called Saifur Rahman, Ph.D., a professor of electrical engineering at Virginia Tech. Dr. Rahman testified that there was "no change in [the] intrinsic property of the current, which is [the] embodiment of power[,] . . . taking place in this T&D [S]ystem." The word "processing" was not used in the "electric power industry." On the generation side, Dr. Rahman opined that the term "processing" properly could be used to describe the conversion of a raw material, like coal, to create electric energy. He was asked about the definition of "processing" used by this Court in *Potomac Edison I*. He emphasized that the "preparation, handling or other treatment" was required to be "designed to [e]ffect a particular result[.]" (Quoting *Potomac Edison I*, slip op. at 15.) He opined that because "what goes in [to] the T&D [S]ystem, because what is delivered is identical to what was received, no change in quality or quantity has taken place, therefore it does not [e]ffect a particular result, that means no processing has happened." According to Dr. Rahman, the "direct and predominant use" of the T&D System was to "deliver power."

Timothy Bowman testified that it was the Comptroller's position that the predominant and direct use of the T&D System equipment was for delivery of electricity. In its view, the finished product was produced at the generator site.

Potomac Edison called Dr. Russell on rebuttal. He opined that although he and Dr. Rahman agreed about the science, they disagreed about how to apply the science to the definition of production activity and, more specifically, processing, under the law. Because voltage is an "attribute" of electric power, the changes to that attribute made in the T&D System amounted to processing to effect a result – useable power.

24

In its ruling, the Tax Court reviewed each "bucket" of equipment to determine whether it was used for a "processing" purpose. It concluded that the conductor wires and cables continually processed electricity by "stripping, or harnessing, electrons from the atoms in which they reside and directing them to move in an organized, unified manner." Because without the conductors, "electricity in the form that consumers use could not be produced and would not exist[,]" the Tax Court found that that equipment was exempt.

The Tax Court also found the transformer and substation categories of equipment to be exempt. Both types of equipment "produce[] and constantly process[] the voltage of the electricity that customers purchase and consume." Because electricity leaves the power plant at a voltage that is unusable by typical consumers and "cannot be sold[,]" the transformer and substation equipment are needed to "process and reduce the[] high voltage to lower voltage" so the electricity is useable. Further, the conductor, transformer, and substation equipment each predominantly process, rather than deliver, electricity. Unlike a pipe or a conveyor belt, they "process the physical composition of the electricity" rather than moving it from point A to point B. In sum, the Tax Court ruled that Potomac Edison's conductor, substation, and transformer equipment were exempt from sales tax under TG § 11-210, as they are used "directly and predominantly" for a "production activity."

In contrast, the Tax Court found that the distribution and foundation support structure categories of equipment were not exempt. It determined that the distribution equipment, consisting primarily of electric meters, is used to measure customer usage, not to process the electricity. Likewise, the support structure equipment, consisting of the

25

physical support for other T&D System components, is not used predominantly to process electricity.

Consistent with these rulings, the Tax Court determined that Potomac Edison was entitled to a refund of $2,420,163.20 – comprising $1,149,488.10 for conductor equipment, $636,646.07 for substation equipment, and $634,029.03 for transformer equipment. It also determined that, under TG § 13-603, Potomac Edison was entitled to interest on its refund because it had paid the sales and use taxes on the categories of equipment now deemed exempt based upon the Comptroller's policy, not due to an error or mistake on its part.

**c.**

The Comptroller contends that the Tax Court erred by ruling that Potomac Edison's conductor equipment, substation equipment, and transformer equipment is used to process electricity. Even if the T&D System does process power, however, the Comptroller asserts that the evidence before the Tax Court demonstrated that, "at best, it equally uses the equipment for delivery and processing[,]" negating the possibility that processing was the predominant use.

Potomac Edison responds that the Comptroller is attempting to relitigate the prior appeal to this Court. It maintains that we should affirm the Tax Court's decision because it was supported by substantial evidence in the record and is consistent with our decision in *Potomac Edison I*. We agree with Potomac Edison.

As a threshold matter, we will not revisit the issues decided by this Court in *Potomac Edison I*, which are the law of the case and are not subject to being challenged in this

26

appeal.[9] *See Schisler v. State*, 177 Md. App. 731, 743 (2007) (explaining that the law of the case doctrine stands for the proposition that a "ruling of an appellate court upon a question becomes the 'law of the case' and is binding on the courts and litigants in further proceedings in the same case" (cleaned up)). Consequently, the Comptroller's arguments concerning the legislative history surrounding the exemption for production activity and its contention that this Court should apply the "substantial change test" to determine whether an activity is a production activity, instead of the definition adopted by this Court in *Potomac Edison I*,[10] are not properly before us and we will not address them.

The issue that is before us for decision concerns the Tax Court's application of TG § 11-210(b)(1) to the categories of T&D System equipment. As set out above, TG § 11-210(b)(1) exempts from sales and use tax purchases of tangible personal property if that property is "used directly and predominantly in a production activity[.]" The phrase "[u]sed directly and predominantly in a production activity" is defined by regulation to mean:

> (a) Use of the property is integral and essential to the production activity, occurs where the production activity is carried on, and occurs during the production activity; and

---

[9] In its reply brief, the Comptroller concedes that this Court is "constrained" by our decision in *Potomac Edison I*, but argues that the Supreme Court of Maryland would not be so constrained were it to grant a petition for *certiorari* review following our decision in this appeal and cross-appeal. There is no need for us to address that argument at this juncture.

[10] We note that in *Potomac Edison I*, this Court cited to the case relied upon by the Comptroller in support of this argument but did not adopt the definition advanced by the Comptroller. *See Potomac Edison I*, slip op. at 17.

(b) Property used both in production activities and administrative, managerial, sales, or any other operational or nonoperational activities is used more than 50 percent of the time directly in production activities.

COMAR 03.06.01.32-2(B)(2).

Thus, we must determine whether there is substantial evidence in the record to support the Tax Court's ruling that Potomac Edison's conductor equipment, substation equipment, and transformer equipment was "integral and essential" to a production activity and served that purpose more than fifty percent of the time. It is not our role to reevaluate the evidence presented to the Tax Court. Rather, we are concerned only with whether the Tax Court's decision was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Whiting-Turner Contracting Co.*, 462 Md. at 490 (cleaned up). *See also FC-Gen Operations Invs.*, 482 Md. at 359. Plainly, it was.

We need not repeat the testimony set out above. Suffice it to say that the expert opinions of Dr. Russell and Mr. Hozempa that the conductor, substation, and transformer equipment was used predominantly to step up and step down voltage, which was a processing function designed to make the electricity useable to the end customers, was substantial evidence supporting the Tax Court's decision and was consistent with the definition adopted by this Court in *Potomac Edison I*. The Comptroller's reliance upon excerpts of these witnesses' testimony in which they conceded that this equipment served a dual purpose, and that delivery of electricity to the customers was a "primary purpose" of the equipment, does not detract from these experts' opinions that the stepping up and stepping down of the voltage was necessary and integral to carry out that purpose and would, in fact, be impossible without it. It was the role of the Tax Court, as fact finder, to

28

weigh the competing expert testimony on this topic and resolve conflicts in the evidence. We hold that a reasoning mind could have reached the same conclusion as the Tax Court. *See, e.g.*, *Geier v. Md. State Bd. of Physicians*, 223 Md. App. 404, 442 (2015) (explaining that when an expert testifies before an administrative agency, that agency "may make its own decisions about . . . the logic and persuasiveness of their testimony, and the weight to be given [to] their opinions").

## II.

Interest on refunds is governed by TG § 13-603, which states in relevant part:

(a) Except as otherwise provided in this section, if a claim for refund under § 13-901(a)(1) or (2)[11] or (d)(1)(i) or (2)[12] of this title is approved, the tax collector shall pay interest on the refund from the 45th day after the claim is filed in the manner required in Subtitle 9 of this title to the date on which the refund is paid.

(b) A tax collector may not pay interest on a refund if the claim for refund is:

* * *

(2) based on:

---

[11] These sections state:

(a) A claim for refund may be filed with the tax collector who collects the tax, fee, or charge by a claimant who:

(1) erroneously pays to the State a greater amount of tax, fee, charge, interest, or penalty than is properly and legally payable;

(2) pays to the State a tax, fee, charge, interest, or penalty that is erroneously, illegally, or wrongfully assessed or collected in any manner[.]

TG § 13-901(a)(1)–(2).

[12] These sections pertain to Maryland estate taxes and are not pertinent.

29

(i) an error or mistake of the claimant not attributable to the State or a unit of the State government[.]

In this case, the Tax Court ruled that Potomac Edison was entitled to interest on its refund because it made an overpayment of sales and use tax not as a result of its mistake or error but because it was "following Comptroller policy to pay tax on the categories of equipment based on the Comptroller's misreading and interpretations of the appropriate statutory exemptions."

The Comptroller contends that the Tax Court erred by so ruling because there was "[n]o factual dispute . . . that Potomac Edison erroneously paid the sales-and-use tax it seeks in its refund claim due to 'accounting system irregularities.'"[13] Potomac Edison responds that it "erroneously paid more sales and use tax on its purchases of [exempt] equipment" because at the time it paid the taxes, the Comptroller took the position that the equipment was not exempt. This was not a mistake on Potomac Edison's part. Consequently, it was entitled to interest.

Both parties rely upon the Supreme Court of Maryland's decision in *Comptroller of Treasury v. Science Applications International Corporation*, 405 Md. 185 (2008). In that case, SAIC, a Maryland corporation, filed an income tax return claiming a refund of nearly $700,000, which the State timely paid. Three years later, SAIC filed an amended tax return for the same period claiming an additional refund of over $4 million on the ground that a

---

[13] This language appears in a brief filed by Potomac Edison in the Tax Court in which it explained that it contested the April 8, 2011 assessment and also sought a refund of taxes it had previously remitted on the same types of equipment due to "accounting system irregularities."

gain from a sale of certain stock was not taxable. The Comptroller denied the refund and SAIC appealed to the Tax Court, which reversed the Comptroller's decision. The Comptroller did not seek judicial review of that decision. Thereafter, SAIC filed a motion in the Tax Court to compel the Comptroller to pay interest on the refund. The Tax Court granted the motion, ruling that the Comptroller was obligated to pay interest from the time SAIC claimed the refund until the time that the State paid it, and that decision was affirmed on judicial review. The Comptroller appealed that decision and the Supreme Court of Maryland granted *certiorari* on its own initiative prior to review in this Court.

After rejecting the Comptroller's arguments that the SAIC's claim for interest was barred by res judicata and that the Tax Court lacked jurisdiction to compel payment of interest, the Supreme Court turned to the merits of the claim for interest on the refund. As in this case, the Comptroller argued that SAIC was not entitled to interest on its refund because its claim for a refund was based upon an error or mistake made by SAIC that was not attributable to the State. The Tax Court had rejected that argument, finding that SAIC "used reasonable judgment under the circumstances" based upon "laws, regulations, or policies expressed by the State" to reach the "mistaken conclusion that tax was owed." *Id*. at 197. The Comptroller maintained that, unless that State assessed a tax or took other affirmative action to collect it, the payment of the tax could not be attributable to the State.

The Supreme Court reasoned that for the error or mistake exception to the mandate in TG § 13-603(a) to apply, two prongs must be satisfied:

> 1) it must be an error or mistake of the claimant, and 2) it must not be attributable to the State or a unit of the State government. If a claim does not

31

> meet one of those two elements, *i.e.*, it is not an error of the claimant or it is an error attributable to the State, interest on the refund must be paid.

*Id*. at 199 (emphasis omitted). Further, in construing the predecessor to TG § 13-603, the Supreme Court had concluded that "'the General Assembly intended that interest be paid on refunds unless the overpayment was due *solely* to taxpayer mistake or error.'" *Id*. (quoting *Comptroller of Treasury v. Fairchild Indus., Inc.*, 303 Md. 280, 286 (1985) (emphasis in *Fairchild*)). Because both parties agreed that SAIC's payment of the tax was erroneous, the only issue concerned whether that error was attributable to the State. The Supreme Court held that the Tax Court's determination that SAIC originally paid the tax based upon a policy of the State that later was rejected and, therefore, its payment of that tax was attributable to the State, was supported by substantial evidence in the record and was legally correct. The Court emphasized that the Comptroller had denied SAIC's refund request after SAIC filed its amended return, which was reflective of the policy upon which SAIC had initially relied in paying the tax.

We return to the case at bar. Since at least March 22, 2011, the Comptroller has taken the position that the conductor, transformer, and substation equipment upon which sales and use tax was assessed against Potomac Edison was not exempt from that tax – a position rejected by Tax Court, the circuit court, and now this Court. The Comptroller has not paid the refund requested by Potomac Edison on those categories of equipment. Under the authority of *Science Applications*, because the overpayment of tax for this equipment was based upon a policy of the State, it was attributable to the State regardless of whether

32

accounting system irregularities also contributed to the overpayment. We thus affirm the

Tax Court's award of interest on the refund.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE MARYLAND TAX COURT. COSTS TO BE PAID BY THE APPELLEE/CROSS-APPELLANT.**